Lori EDWARDS, Plaintiff,

v.

SCHLUMBERGER–WELL SERVICES, a (DIVISION OF SCHLUMBERGER TECHNOLOGY, INC.), Defendant.

No. CIV A. 96–3184 (JEI)

United States District Court, D. New Jersey.

Oct. 28, 1997.

Markowitz & Richman by Diane L. Newman, Haddonfield, NJ, for plaintiff.

Kelley Drye & Warren by Robert E. Crotty, Joseph A. Boyle, Parsippany, NJ, for defendant.

## OPINION

IRENAS, District Judge.

## I. Introduction

In March 1995, defendant Schlumberger–Well Services laid off 29 employees. One of the individuals laid off was plaintiff Lori Edwards. Plaintiff, a New Jersey resident, has filed a four-count complaint in connection with her layoff. Count I alleges gender discrimination in violation of the New Jersey Law Against Discrimination. Count II alleges a breach of contract. Count III alleges a breach of the covenant of good faith and fair dealing. Count IV alleges intentional infliction of emotional distress. Pursuant to 28 U.S.C. § 1446(b), defendant Schlumberger Well Services, a division of Schlumberger Technology Corporation, a Texas corporation, timely filed a notice of removal on July 12, 1996. This Court has jurisdiction under § 1332(a)(1).

Now before this Court is defendant's motion for summary judgment on all four counts of the complaint. For the reasons set forth below, this Court will grant the motion for summary judgment as to Counts II, III and IV, and deny defendant's motion for summary judgment as to Count I.

## II. Background

### A. *Lori Edwards's Employment at Schlumberger*

Schlumberger–Well Services is a division of Schlumberger Technology, Inc., located in New Jersey. Schlumberger's Princeton, New Jersey, facility is known as EMR Photoelectric ("EMR"). EMR manufactures oil exploration detection devices (minitrons[1] and photoelectric equipment) and anti-missle detection systems. Plaintiff Lori Edwards began working at EMR on November 9, 1978. For approximately three years, plaintiff worked in EMR's "front end" where the parts used for minitrons and photoelectric equipment are cleaned and prepared. At various times thereafter, Edwards worked in the "dust free" area making parts and assembling tubes, in the acid labs cleaning and treating tubes and other parts, in the tumbling lab working on another part of EMR's cleaning process, and in the metalizing lab applying paint to the Kovar rings of assembled tubes and putting tubes into a piece of equipment in which silver is evaporated and put on the tubes' glass. Edwards also worked for a short time in EMR's hydrogen

---

**1.** A minitron is filled with tritium and emits neutron particles which are generated by passing extremely high voltage electrical current through the tritium. The neutron particles bounce off the earth's strata and return signals to the photoelectric equipment which tells the user the make-up of the earth's strata.

furnace room where parts are fired at different temperatures.

On approximately May 12, 1982, after applying for a posted opening, Edwards began to "process minitrons." In this process, targets in the minitrons are heated, "out gassed," and then loaded with tritium and deuterium. Because of the radiation involved,[2] at least some part of this work takes place in EMR's "outside building." During the time that Edwards worked in the outside processing building, she continued to perform other duties, including wiring and testing for specific generators.

In approximately 1989 or 1990 Edwards also began working with a piece of equipment called a Titanium Ball Evaporator ("Ti-ball Evaporator"). The Ti-ball evaporator evaporates copper targets onto a disk. It was located in different parts of EMR's main building at different times during Edwards's employment, but always in the main building. Whether Edwards would be "outside" processing tubes [3] or in the main building making targets depended upon whether EMR needed tubes or targets at a given time. During busy periods, as much as 40% of Edwards's time was spent working with the Ti-ball evaporator.

Schlumberger laid off 23 employees in 1991, not including Edwards. At some point in 1992, Schlumberger laid off 14 employees. Edwards survived these layoffs. From June to September in 1992, Edwards was out on maternity leave. In the summer of 1992, either just before or during her maternity leave, Edwards was promoted to the job level classification known as Manufacturing Technician II–Mechanical. After the 1992 layoffs, Edwards was the only EMR employee with the job title of Manufacturing Technician II–Mechanical. After EMR reorganized its operations in September 1994, Edwards was

working in the newly designated Generators Group assembling minitrons, and was still a Manufacturing Technician II–Mechanical employee.[4]

### B. Edwards's Work with Vacuum Systems

Minitrons and other photoelectric equipment must be manufactured under a vacuum in order to prevent foreign particles from being introduced into the manufacturing process. Accordingly, the "outside" building is equipped with vacuum systems. At some point, apparently as a result of layoffs taking place around 1985 or 1986. Edwards was made responsible for maintaining the outside building's vacuum systems and the equipment used to measure radiation levels. Apparently in connection with her new vacuum duties, in August 1986, Edwards was sent by EMR to a one-week course in vacuum technology. Edwards learned how to work with and maintain vacuum systems, and how to make certain repairs on them. Edwards's vacuum maintenance duties in the outside building entailed baking out the roughing pumps, changing pots, putting chlorohydrins and deuterium tritium into the pots, and greasing valves. Edwards also worked with the vacuum systems in the main building in connection with her operation of the Ti-ball evaporator.

### C. Kevin Lewis's Employment History with Defendant

Responding to an employment advertisement, Kevin Lewis interviewed with EMR some time in 1985 for the position of vacuum maintenance mechanic. He was hired around that same time, and was given the responsibility of maintaining EMR's high-vacuum systems equipment. Lewis had picked up vacuum skills while in the Marines,

---

**2.** Tritium is a radioactive isotope of hydrogen. Deuterium, or "heavy hydrogen," is a nonradioactive isotope of hydrogen.

**3.** The phrase "processing tubes," as it has been used in depositions, appears to refer to the loading of tritium and deuterium.

**4.** While the organizational grouping of EMR employees prior to September 1994 are not clear, it

is uncontested that in September 1994, EMR reorganized its operations along its three product lines: (1) the generator group producing minitrons; (2) the standard detector group producing photoelectric cells; and, (3) the advanced detector group making photoelectric cells for military use. It does not appear to be accurate or helpful to speak of a distinct "generator group" as being in existence prior to September 1994.

and had built upon and applied them during a year-long job at a company called Infrared and Associates where he also learned to fix vacuum equipment. Lewis initially worked in EMR's maintenance department and performed general maintenance tasks in addition to vacuum work. He estimated that he spent 60% of his time performing maintenance on the high-vacuum equipment. At some point in 1992, Lewis's job title changed from vacuum maintenance mechanic to Manufacturing Technician II—Systems, but his duties did not change at that time.[5]

The record is replete with references by EMR supervisory and managerial personnel to Lewis's skills at troubleshooting, diagnosing problems with, and repairing EMR's vacuum systems. For example, James Thornton, head of the Generators Group, has stated that Lewis "knew how to come up with ideas to make [the vacuum systems] better and do repair work," "did a lot of repair work," "had a lot of diagnostic skills" and probably is still the plant vacuum systems "expert." (Thornton Dep. at 77). Thornton says that he was told when he arrived at EMR that Lewis knew more about the vacuum systems than anyone else, and that "over time I witnessed it firsthand." (Thornton Dep. at 81). Defendant states that Lewis "was the sole person with vacuum expertise at defendant's facility" at the time of the 1995 layoffs. (Defendant's Responses and Objections to First Set of Interrogatories at 9). Lewis's employment appraisals include references to Lewis's ability to diagnose and repair EMR's vacuum systems quickly and to his outstanding working knowledge of the vacuum systems. (*See* Supp. Cert. of Joseph A. Boyle, Ex. A).

At some time in 1992, Lewis also learned how to process minitrons and to melt targets in the Ti-ball evaporator. During the period of Edwards's maternity leave, from June to September in 1992, Lewis performed some portion of Edwards's duties in EMR's "outside" building, including the outside building minitron processing. In November 1994. Kevin Lewis was moved—functionally, if not formally,—into the Generators Group. He assumed responsibility for operating the Ti-ball evaporator. For about four months prior to the 1995 layoffs, then, Lewis operated the Ti-ball evaporator while continuing to perform vacuum maintenance work around the plant.[6]

### D. *Edwards's Discussions with EMR's Personnel Manager About her Fate in the Event of Layoffs*

Edwards became concerned at this time about Lewis's move into the generators group because she perceived that business was slow and that there wouldn't be enough work to occupy both her and Lewis. She initiated a conversation with Rebecca Millard, EMR's personnel manager, in November 1994, about this concern. According to Edwards, Millard told her that "if there ever were to be a layoff, they would get rid of me and keep Kevin." Edwards alleges that Millard continued as follows: "She said because, first of all, there wasn't enough work for both of us, and if there was to be a layoff, she said, me being female; him being male, they're going to choose him because the fellows don't want you out there anyway." (Edwards Dep. at 47). Edwards was advised by Millard that her job would be at risk as long as she stayed in her current group. Millard told her that she should try to "bump" into a front end position where under company policy her experience and seniority would protect her in the event of a layoff. (Edwards Dep. at 47). Edwards began to cry, and Millard then "stated ... how things were around there with male versus female, how females were never number one on their priority list, how females never get the same kind of raises as men do there." (Edwards Dep. at 47).

---

**5.** Lewis's employee appraisals for 1985, 1986, and 1989–1991, list his job classification alternately as "Vacuum Tech/Maintenance Mech." (1985, 1986). "Master Vacuum Technician" (1990, 1991), and "Sr. Vacuum Tech." (1989).

**6.** Edwards saw a posting at EMR in October 1994, which said that Lewis had been transferred into the manufacturing side of the Generators Group. (Edwards Aff. at ¶ 7). James Thornton, head of the newly designated generators group as of October 1994, later told Edwards that Lewis in fact would be working on the research side of the group. (Edwards Aff. at ¶ 8).

Edwards says that Millard told her that James Thornton "really didn't want me out there." Millard told her that "[e]verbody that was in the staff meeting, that when it came to me, didn't want me out there any more." Millard told her that this sentiment was based solely on the fact that Edwards was female. (Edwards Dep. at 49–50). Edwards identifies Thornton and Harold Pfutzner as being the "guys" who, in Millard's account, did not want her working outside. (Edwards Dep. at 49).

Recognizing that Edwards was highly upset by this meeting, Millard bought and gave her flowers later that day. Other EMR employees have described Edwards's emotional state after this meeting. Cardarelli, Dolores Brightwell, a former personnel department employee, and Spring Taylor, a wiring department employee, say that Edwards was extremely upset, "uncontrollable" "hysterical" and crying. (Cardarelli Dep. at 41–42; Brightwell Dep. at 52, 54; Taylor Dep. at 18, 22). Cardarelli says that Edwards told him after her conversation with Millard that Millard had said that EMR was getting rid of Edwards at the next layoff. (Cardarelli Dep. at 41). Brightwell says that Edwards told her after her meeting with Millard that EMR was going to give her job to Lewis. (Brightwell Dep. at 54). Taylor gives essentially the same account of what Edwards was telling her co-workers after the meeting with Millard: that her job was in jeopardy, apparently because of Lewis. (Taylor Dep. at 18).

Edwards reports approaching James Thornton and telling him about what Millard had said. She states that Thornton told her that she would not be replaced by Lewis in the event of a layoff. (Edwards Aff. at ¶ 9). Thornton denies making this statement to her. (Thornton Dep. at 124). Cardarelli, Brightwell and Taylor recall learning from Edwards or from other sources that Thornton had made this statement to Edwards. (Cardarelli Dep. at 46–47; Brightwell Dep. at 57–58; Taylor Dep. at 26). Brightwell says that she approached Thornton about what had been said in Edwards's meeting with Millard, and that he said: "[T]hat's bullshit. She's not—Kevin is not going to get her job." Brightwell says she told Thornton that he ought to go talk to Millard then, given what she had said. Brightwell alleges that she saw Thornton and Millard visiting each other's offices that day. (Brightwell Dep. at 56–57).[7]

### E. *The March 1995 Layoffs*

The parties dispute when the March 1995 layoffs first were contemplated and discussed by EMR management. EMR managers maintain that the first management meeting regarding the layoffs occurred in early March, 1995. (Millard Dep. at 71; Thornton Dep. at 53; Pietras Dep. at 33). There were rumors of layoffs circulating in September and October of 1994. (Cardarelli Dep. at 42). Edwards alleges that Robert Matolka, EMR's former safety manager, told her that he had begun attending management meetings regarding layoffs in October 1994. (Edwards Aff. at ¶ 10).

Through several deponents, defendant has described how the employees to be laid off in March 1995 were selected. EMR's various

---

7. Millard provides a different account of her meeting with Edwards. Millard wrote up an account of her November 15, 1994, meeting with Edwards some time in December 1994, after conversations with James Thornton and Terry Warnell. This account, she states, was based on notes that she took during the meeting but no longer has in her possession. (Millard Dep. at 153). This account is three and a half pages of single-spaced type. Millard confirms much of the substance of Edwards's account, but denies having told Edwards that females were low priority or that the decision to keep Lewis and let Edwards go would be gender-based in any way.

Millard also says that they discussed Edwards's real and perceived difficulties getting along with other EMR personnel, particularly, it seems, with EMR's male management staff. Millard says that Edwards was trying out loud to figure out how to get them to like her. Millard says that she told Edwards that she should meet calmly with Thornton and not try to get into an emotional "Kevin v. Lori" discussion. Millard says that she told Edwards: "The one thing this female has learned in her years working with only men .... the second we become emotional, we scare them to death. They feel backed in a corner and we don't accomplish anything." (Plaintiff's Response to Motion for Summary Judgment, Ex. 9).

managers, or department heads,[8] participated in meetings in which the financial figures were reviewed and initial determinations were made regarding how many persons would need to be laid off. The managers went through a process of figuring out which employees had which skills, who was dispensable and who was not, which employees if retained could take over functions performed by employees to be laid off, and generally how the layoffs could be conducted and job duties shuffled so that EMR could continue to manufacture its products. (*See* Thornton Dep. at 62–67, 88–89; Millard Dep. at 89–94, 98–101; Pietras Dep. at 35–39; Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories at 9–10).

At this time James Thornton was in charge of the Generators Group and was essentially responsible for making the recommendations as to which employees in his group would be laid off. (Thornton Dep. at 64). In his short tenure at EMR, Thornton had familiarized himself with the generator groups employees, their skill bases and their job performance in his short time at EMR through discussions with those employees, their supervisors and other managers.[9] While the recommendation to let a generators group employee like Edwards would be made by Thornton, the final and official decision would be made by John Hunka, EMR's general manager. (Thornton Dep. 64, 112–13).

A total of 29 employees were laid off as a result of the March 1995 reduction in force. Of these 29 people, 21 were men. Edwards was the only Manufacturing Technical II–Mechanical at EMR at the time. With the exception of Kevin Lewis, all five of the other Manufacturing Technical II personnel were laid off: four of them were men; three of them were Manufacturing Technical II–Technical and two were Manufacturing Technical II–Electrical. Of these five, two had more seniority than Kevin Lewis, and one had more seniority than Edwards as well. (Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories at 6–8).

### F. The Decision to Lay off Edwards

Edwards's version of the decision to lay her off can be articulated succinctly. Management did not want Edwards working where she was because she was a woman. Kevin Lewis wanted her job. Knowing that layoffs were imminent, management moved Lewis into Edwards's group to perform her job duties. In March 1995, when layoffs became necessary, defendant laid off Edwards instead of Lewis—just as Millard had predicted—even though he had no more skills than her and less time in the company, and gave all of Edwards's duties to Lewis. Defendant tells a different story.

As an initial matter, as discussed above, defendant denies that any layoff meetings, discussions or decisions pre-dated March 1995. Next, according to defendant, the generators group, like the other groups, approached the question of whom to lay off as a question of how many people, and which people, could be let go without crippling the group. Thornton and the other managers considered Edwards' employment consistent with this approach. As of March 1995, Edwards' main job was to process minitrons in the outside building, meaning she loaded tritium and deuterium into the minitrons. She also made targets using the Ti-ball Evaporator in the main building. Edwards did a fine job of processing minitrons and could do a little maintenance, but that was the extent of her skills: when anything happened "she needed to rely on somebody else." (*See* Thornton Dep. at 70, 71–72, 90). Other employees—Don Miller, Lou Cardarelli, Kevin

---

**8.** EMR management personnel participating in these meetings included Rebecca Millard, Mike Zito, Joseph Pietras, Ron Primka, Robert Matolka and James Thornton. (Thornton Dep. at 61; Millard Dep. at 71).

**9.** Thornton indicates that at various times he spoke with John Hunka, the general manager. John Frolio, Edwards' supervisor in the generators group, and Tom Gange (Gange had taken over for Frank Messina who had been a supervisor in Edwards's group) (Thornton Dep. at 64–65). He says that he probably spoke with Harold Pfutzner, one of the managers whom Lou Cardarelli described as questioning him about Edwards' job performance. (Thornton Dep. at 56. 59–60, 69, 72). Thornton did not speak with the other such manager, Mehrzad Mahzadi, about Edwards because Mahzadi had been replaced by Thornton in October 1994 and was no longer at the Princeton facility.

Lewis—knew how to process minitrons and could "do that position." (Thornton dep. at 89).

Kevin Lewis had been in charge of maintaining the vacuum system for the entire plant as of Thornton's October 1994 arrival at EMR. Whether Lewis was formally in the generators group in late 1994 is unclear. Lewis was like other EMR employees whose work spanned production areas; such employees had to be grouped somewhere, but their group assignments essentially failed to reflect the entire range of their work. (Thornton at 74–75). Lewis was helping out and getting more involved in the generators group. He was making targets in the main building. (Thornton Dep. at 73–74).

Apparently, most of EMR's assembled minitrons had been "failing" because of problems associated with the cleanliness of the production system. Lewis had been brought in to make targets "because he had the most expertise" in the vacuum systems; he had the ability to diagnose and fix problems with the vacuum systems and to make the minitrons "technically better" as a result. (Thornton Dep. at 76–77). Lewis in fact did make the vacuum systems "a lot better." (Thornton Dep. at 77). Edwards was occupied processing minitrons at this time. (Thornton Dep. at 147). According to Millard, the conclusion that Lewis was indispensable and the decision to retain him both were reached before the managers discussed Edwards's situation. (Millard Dep. at 118).

As Manufacturing Technical II–Mechanical, Edwards was the only person in her job group for layoff and seniority purposes in March 1995. (Thornton Dep. at 106, 108–09; Millard Aff. at ¶ 3). That fact made her eligible for layoff because "job title" seniority would only protect an employee relative to other employees in the same "job group." (Millard Dep. at 156–57; see Thornton Dep. at 63, 82–83, 86, 107; Plaintiff's Response to Motion for Summary Judgment, Ex. 14).[10] Edwards's fate, however, was determined by a combination of the need to downsize and the presence of other employees who could do her job as well as perform other vital functions. (See Thornton Dep. at 86, 89, 90).

The fact was that Lewis could perform Edwards's processing and target work, and generally run the plant's vacuum systems. As the vacuums systems expert, Lewis was deemed indispensable while Edwards was not. (See Thornton Dep. at 81, 89–90; Millard Dep. at 101, 118). As Thornton put the matter, "Kevin's job skills were a superset of Lori's." (Thornton Dep. at 79).

### G. Events Occurring After the Layoffs

Edwards discusses several events which occurred after she was laid off which she argues are relevant in this case. First, after the March 1995 layoffs, Lewis assumed the bulk of Edwards's job duties. He took over the minitron processing and assumed responsibility for the Ti-ball evaporator. (Thornton Dep. at 131, 132; Lewis Dep. at 39).[11] Edwards also points out that the Ti-ball evaporator, which had been in the main building at all times during Edwards' employment, was moved to the outside building so that Lewis could do his jobs more efficiently.

Second, Lewis received a promotion in approximately September 1995, to Manufacturing Technician III–Systems. Edwards draws attention to Lewis's promotion and raise because of her belief that an employee needed a college degree in order to be a level III employee and the fact that Lewis did not have such a degree.[12] Additionally, Edwards

---

**10.** There is confusion and disagreement concerning what document(s) set out EMR's policy regarding layoffs and seniority. This issue will be discussed below. There also is a dispute concerning how the seniority policy operated generally and whether EMR followed the policy in Edwards's case. It suffices here to explain that the chief disagreement between the parties involves whether EMR's seniority policy was that layoffs were to be conducted according to seniority within production groups (e.g., Generators Group. Standard Detectors Group). or according to seniority measured by level (e.g., I, II, III) and job group (e.g., Manufacturing Technician–Mechanical).

**11.** Defendant maintains that the full range of Edwards's duties were assumed by Lewis, Lou Cardarelli, David Jacoby and Donald Miller. (Responses and Objections to Plaintiff's First Set of Interrogatories, No. 3).

**12.** In the summer of 1992, Edwards spoke with Joseph Pietras, an EMR department head about the prospect of Edwards moving, from her Man-

alleges that EMR had said it was freezing raises and promotions for one year after the layoffs.[13] Edwards also highlights Lewis's promotion because his job duties did not change following his promotion. Finally, Edwards highlights the promotion and raise as evidence that Lewis had a "guardian angel" at EMR in the person of controller Mike Zito.

Third, at some point after March 1995, EMR began to outsource some of the vacuum systems repair work that Lewis formerly had performed.

### H. *The Treatment of Females at EMR*

Edwards suggests that EMR was unfriendly to women. First, EMR's all-male management team was known as "the Boy's Club" because of EMR's all male management staff's practice of excluding Rebecca Millard from staff meetings. (Edwards Aff. at ¶ 6; *see* Taylor Dep. at 26–27). Second, Edwards relates second-hand the story of EMR's sole female engineer's alleged unequal treatment in performance reviews. Third, EMR employs more men than women. Fourth, Delores Brightwell, former assistant to Rebecca Millard, has described EMR as unfriendly to women. Additionally, at all relevant times, Edwards was the only female working in that part of EMR's production process which came in 1994 to be housed in the newly designated Generators Group.

Edwards also suggests that managers at EMR made inquiries concerning Edwards's job performance which suggested gender-bias. Lou Cardarelli, a Manufacturing Technician III—Electrical employee, states that Mehrzad Mahdavi, an EMR manager, asked him questions about Edwards's work and made comments which suggested to him that Mahzadi did not like having a woman working "outside" by herself because there was a lot of responsibility and things that could go wrong. (Cardarelli Dep. at 33–35).

Cardarelli also discussed Edwards's work with Harold Pfutzner, who was, or would later become, group leader of neutron generator development. Pfutzner asked Cardarelli if Edwards was doing her job correctly and whether she could handle things. Cardarelli says that he told Pfutzner that Edwards was doing her job correctly and that that was the end of the discussion. (Cardarelli Dep. at 36–37).

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the

---

ufacturing Technician *II*–Mechanical status to Manufacturing Technician *III*–Mechanical status. Pietras told her that "normally, [the company] wouldn't take your job experience, you had to go to college," and that despite all of Edwards's experience with EMR "it would be kind of difficult" to go from "a 2 to a 3" and he didn't think it could happen. (Edwards Dep. at 69–70).

**13.** Edwards's only support this claim is Lou Cardarelli's deposition testimony that he'd heard John Hunka announce that policy at a meeting. (Cardarelli Dep. at 74–75).

basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992).

## IV. The Discrimination Count

■ Count One of Edwards's complaint alleges a violation of the New Jersey Law Against Discrimination ("NJLAD"). The NJLAD makes it unlawful for an employer to discriminate against an employee on the basis of sex with respect to the terms, conditions or privileges of employment. N.J.S.A. § 10:5–12(a) (West Supp.1997). In applying the NJLAD, New Jersey courts generally follow the standard burden-shifting analysis which applies in federal Title VII actions. *See Bray v. Marriott Hotels,* 110 F.3d 986, 997 (3rd Cir.1997); *Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995); *Tyson v. CIGNA Corp.,* 918 F.Supp. 836, 838–39 (D.N.J.1996); *Khair v. Campbell,* 893 F.Supp. 316, 331 (D.N.J.1995); *Lehmann v. Toys R Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 452 (1993); *Grigoletti v. Ortho Pharm. Corp.,* 118 N.J. 89, 570 A.2d 903, 907 (1990).

This Court initially will discuss whether Edwards has put forth direct evidence sufficient to establish a mixed motives case of gender-based discrimination. The inquiry then will shift to Edwards's prima facie case and the familiar Title VII pretext analysis.

### A. Mixed Motives and Direct Evidence

Relying on the statements about gender-bias made to her by personnel manager Rebecca Millard, Edwards presses a mixed mo-

tives claim. For the reasons that follow, this Court finds that Edwards has failed to adduce the type of evidence necessary to establish a mixed motives case.

To establish a mixed motives case, and to escape thereby the plaintiff's burdens under the traditional Title VII burden-shifting analysis, the plaintiff must come forth with " 'direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' " *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3rd Cir.1994) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)); *see id.* ("[T]he evidence ... must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process.") (citing *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 470 (3rd Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993)).[14] "Neither 'stray remarks' nor 'statements by nondecisionmakers, [n]or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.' " *Price Waterhouse v. Hopkins,* 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J., concurring).

■ Millard's statements themselves do not directly reflect a discriminatory animus on the part of a person involved in the decisionmaking process. First, Millard's role in the decisionmaking process was constricted. Her role in management meetings relating to the March 1995 layoffs was to ensure compliance with EMR's seniority policies and, presumably, to provide the managers with personnel information. (*See* Thornton Dep. at 111). There is no evidence that Millard participated substantively, or exercised any kind of discretion, in the process of selecting employees for layoff.[15] Second, and more to the

---

**14.** New Jersey courts have utilized the mixed-motive analysis as set forth in *Price Waterhouse* in NJLAD cases. *See Jackson v. Georgia–Pacific, Corp.,* 296 N.J.Super. 1, 685 A.2d 1329 (App.Div. 1996); *Rendine v. Pantzer,* 276 N.J.Super. 398, 648 A.2d 223 (App.Div.1994), *aff'd as modified,* 141 N.J. 292, 661 A.2d 1202 (1995).

*Price Waterhouse* was modified by section 107(c) of the 1991 Civil Rights Act. This modifi-

cation does not affect the analysis or outcome in this case.

**15.** Edwards would have this Court view Millard as a decisionmaker because Millard speaks of what "we" did in management's layoff meetings. But Millard has clarified repeatedly that decisions were made by the department heads. (Millard Dep. at 89, 94, 118).

point, Millard's comments to Edwards were not themselves discriminatory statements made in the decisionmaking process, but rather were statements about discriminatory views that were held by decisionmakers.

In order to constitute evidence directly reflecting the fact that decisionmakers placed substantial reliance on her gender in reaching their decision to lay her off, Edwards's testimony would have to reflect what decisionmakers actually said in connection with the decisionmaking process. The first difficulty for Edwards is that she does not allege that Millard was repeating for her, or even paraphrasing, statements made by James Thornton, Harold Pfutzner or other managers. The relevant portion of Edwards' deposition testimony reads as follows:

Question: You stated in your Complaint that, "Plaintiff was informed by Miss Millard that if there was ever to be a layoff, they would keep Kevin and get rid of you. Plaintiff questioned the reasoning for this and was told that because the guys would not want you because you are a female." What guys are you referring to there?

Answer: Harold Fitzner [sic], Thorton [sic], all the ones on the research side. I don't know about Joel Groves. Mainly, Harold and James.

Question: Did Miss Millard mention those names to you during the meeting?

Answer: She talked about James Thorton, yes.

Question: What did she say about James Thorton?

Answer: That he really didn't want me out there.

Question: Did she tell you that James Thorton had told her that?

Answer: No.

Question: Did she tell you why James Thorton didn't want you out there?

Answer: No. All she did was tell me that in the staff meetings that they had, the only person that really stuck up with me was Joe Pietras. Everybody that was in the staff meeting, that when it came to me, didn't want me out there any more.

Question: First of all, do you know who attended these staff meetings?

Answer: Just department heads, that's all I know.

Question: Did she give you a reason as to why they didn't want you out there?

Answer: Because I was a female.

Question: That was the only reason she gave you?

Answer: Yes.

(Edwards Dep. at 49–50). There is no basis upon which to conclude that Millard offered anything other than her own opinion or interpretation of how certain managers felt about Edwards's employment. Edwards's testimony about Millard's opinion might be circumstantial evidence of discrimination, but it is not the kind of evidence directly reflecting discriminatory animus in the decisionmaking process needed to make out a mixed motives case.

■ Even if this Court were to infer that Millard in fact was relating actual gender-biased statements which had been made by certain unspecified managers, Edwards's testimony about what Millard told her would be inadmissible double hearsay. This Court will not consider such inadmissible evidence on this motion for summary judgment. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3rd Cir.1996); *Horta v. Sullivan*, 4 F.3d 2, 8–9 (1st Cir.1993).

The leading Third Circuit case on point is *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996 (3rd Cir.1988) (ADEA case). The plaintiff there asked why an adverse employment decision had been made. His supervisor told him that "they wanted a younger person for the job." The plaintiff's testimony at trial offering the supervisor's statement was double hearsay. The supervisor's statement to the plaintiff might have been admis-

sible as a party admission, but his comment about what "they" might have wanted was more problematic. The Third Circuit concluded that someone not identified in the record had made a statement to the supervisor which he then related to the plaintiff. In order for the plaintiff's testimony to be admissible, there had to be a basis for admitting the statement that "they" had made. Failing to establish a foundation to identify the unknown "they," and thus failing to identify the "they," the plaintiff did not meet the evidentiary requirements of both Federal Rules of Evidence 801(d)(2)(D) and 805.[16] *Id.* at 1002; *see Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1216 (3rd Cir.1995) (discussing *Carden*); *Cedeck v. Hamiltonian Fed. Savs. & Loan Ass'n*, 551 F.2d 1136 (8th Cir.1977) (holding that plaintiff's testimony in employment discrimination case about statement made to her by manager was inadmissible hearsay because it included statement made by others who were unidentified).

Though the evidence is to be viewed in the light most favorable to Edwards, this Court would be uneasy construing Edwards's testimony as being that Millard told her that "they said that they did not want me working in the outside building because I am a female." Even if this Court were willing to so construe Edwards's testimony,[17] Edwards still would have to grapple with the double hearsay problem. As in *Carden*, the declarant would be an unidentified "they." In some cases the circumstances are such that a court is able to infer from the record who the possible speakers were, and to satisfy itself that all of the individuals who possible made the discriminatory statements at issue were agents of the employer acting within the scope of their employment. In such cases the discriminatory statements are admissible as party admissions under Rule 801(d)(2)(D). *See Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134–35 (3rd Cir.1997); *U.S. v. Cruz*, 910 F.2d 1072, 1081 n. 10 (3rd Cir. 1990), *cert. denied*, 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991) (discussing *Carden*); *Carden*, 850 F.2d at 1002 (rejecting plaintiff's argument that court could infer from record who the "they" were because "they" never were identified in record).

The instant case is not such a case. First, there are no dates attached to meetings attended by Millard in which sexist statements may have been made, nor has Edwards testified about what issues were being discussed in those meetings. Second, whatever the nature of the meetings, and whenever they might have occurred, Edwards's testimony about what Millard told her about those meetings does not include a firm or reliable account of exactly who attended them. This Court cannot be confident then, either that the meetings were part of the pertinent decisionmaking process, or that all of the possible speakers would have been speaking "within the scope of the[ir] agency or employment" so as to qualify their statements as 801(d)(2)(D) admissions.

Edwards has stated that Millard told her that James Thornton and Harold Pfutzner were the managers who did not want Edwards working in the outside building. Even if this Court were inclined to entertain an inference based on this fact to the effect that Thornton and Pfutzner were the utterers of any sexist statements Millard may have heard, the outcome would not change. First, regarding Thornton, this Court notes that Edwards has said that Millard did not tell her that Thornton had said that he did not

---

**16.** Rule 801(d)(2)(D) provides that a statement is not hearsay if the statement is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

Rule 805 provides that "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

**17.** In *Carden* the Third Circuit appears to have undertaken just such a construction. The plain-

tiff testified that his supervisor had told him that "they wanted a younger person for the job." This testimony was construed in effect as being that the supervisor had told him that "they *said* they wanted a younger person." The *Carden* Court has been criticized for reading in the verb "said" in order to find that the plaintiff's testimony was double hearsay. *See Brom v. Bozell, Jacobs, Kenyon & Eckhardt, Inc.*, 867 F.Supp. 686, 694 n. 8 (N.D.Ill.1994) ("[T]he Third Circuit inexplicably ignored the fact that the supervisor's statement was expressly a statement of his thoughts as to what others wanted.").

want Edwards working outside. Edwards also has stated that Millard did not tell her that Thornton had said that he did not want Edwards working outside because of her gender.

■ Second, absent a showing that Pfutzner was involved as an agent of EMR, acting within the scope of his employment, in the decision to lay off Edwards, Edwards's testimony identifying Pfutzner as being a manager who did not want her working outside cannot be considered to be evidence directly reflecting discriminatory animus in the decisionmaking process.[18] Edwards has failed, however, to adduce evidence showing that any sexist statements which may have been made by Pfutzner, or by any other managers for that matter, were made in connection with the decisionmaking process.

■ Participants in EMR meetings dealing with the March 1995 layoffs state that the first discussions of the March 1995 layoffs by management occurred in early March 1995. (Millard Dep. at 71; Thornton Dep. at 53; Pietras Dep. at 33). Edwards, however, states in her affidavit that Robert Matolka, EMR's former safety manager, told her that he had begun attending meetings regarding the layoffs in October 1994. (Edwards Aff. at ¶ 10).[19] Edwards does not say that Matolka told her that any concrete layoff decisions were being discussed or contemplated at those meetings, let alone that her employment status was discussed. Additionally, because no dates have been attached to the management meetings attended by Millard in which statements allegedly were made about Edwards working, outside, even if this Court were to accept as evidence Matolka's statement that he began attending meetings "regarding" layoffs in October 1994, there still would be no evidence that

these meetings were the ones in which sexist opinions about Edwards's employment were expressed. In short, there is no evidence that the meetings of which Millard spoke were held after discussions and meetings concerning the March 1995 reduction in force had gotten underway. Edwards cannot show that any sexist statements which may have been made at management meetings were connected to the layoff decisionmaking process generally, let alone connected to the decision to lay off Edwards which was reached in March 1995. Statements temporally remote from the employment decision generally do not constitute evidence directly reflecting discriminatory animus in the decisionmaking process.[20] *See Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 545 (3rd Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993): *Khair v. Campbell Soup Co.,* 893 F.Supp. 316, 333 (D.N.J.1995).

■ Evidence that sexist sentiments may have cropped up from time to time in EMR's management ranks of course may be circumstantial evidence of discrimination in Edwards's case. But the analysis undertaken to decide whether the *Price Waterhouse* mixed motives framework should be invoked looks for evidence of expressions of such attitudes at those moments when an employment decision actually is being made, and on the part of those individuals who actually are responsible for arriving at that decision. Edwards simply fails to adduce this kind of evidence and fails thereby to establish a mixed motives case.

B. *Pretext*

1. *The Prima Facie Case*

■ Under the shifting burdens analysis of *McDonnell Douglas Corp. v. Green,* 411

---

18. Pfutzner has not been identified as one of the managers who attended layoff meetings at which the decision to layoff Edwards was made. (*See* Millard Dep. at 71, 116; Thornton Dep. at 61).

19. There is evidence that Matolka was at the early March 1995 meetings concerning that month's layoffs. (*see* Millard Dep. at 71). He has not been deposed.

20. Edwards also has failed to lay a foundation for her testimony as to what she says Matolka told her. Edwards does not say when Matolka

told her about the October 1994 meeting. Matolka himself was laid off in March 1995. If Matolka's statement to Edwards was made after he was laid off, it could not be treated as a party admission. *See* Fed.R.Evid. 801(d)(2)(D) (to qualify as non-hearsay, agent's statement must have been made during course of agency relationship). Inadmissible hearsay in an affidavit will not be considered on a motion for summary judgment. *See Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 n. 1 (3rd Cir.1996); *Horta v. Sullivan,* 4 F.3d 2, 8–9 (1st Cir.1993).

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in a reduction in force ("RIF") case, the plaintiff initially must establish a minimal prima facie case: she must show that she is a member of a protected class, that she was qualified for the employment position at issue, and that she was laid off while other unprotected workers were retained. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3rd Cir.1994); *Seman v. Coplay Cement Co.*, 26 F.3d 428, 431 (3rd Cir.1994); *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 n. 3 (3rd Cir.1991); *Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1263 (D.N.J. 1994), *aff'd*, 67 F.3d 291 (3rd Cir.1995); *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The plaintiff also must be "similarly situated in terms of qualifications and position" to the unprotected employees who were retained. *See Maidenbaum*, 870 F.Supp. at 1263.

■ Edwards's claim at this stage of the analysis is that she was well-qualified to do her job, that she had more seniority than Lewis, that she was laid off while Lewis was retained, and that Lewis subsequently assumed her chief job duties. EMR argues that Edwards has failed to state a prima facie case. EMR maintains that she has not established a prima facie case.

The plaintiff's burden of presenting a prima facie case is not intended to be an onerous one. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3rd Cir.), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). To find that Edwards has failed to make out a prima facie case, this Court would be required to conclude early in the analysis that circumstances at EMR forced EMR to combine Edwards's job duties with other functions so as to produce a new job for which she no longer was qualified. Because there is no "obvious and indisputable difference" between Edwards's job and Lewis's post-layoff job, summary judgment for failure to establish a prima facie case is unwarranted here. *Cf. Maidenbaum*, 870 F.Supp. at 1263 (summary judgment appropriate at prima facie stage

because laid off plaintiff casino employees who were licensed to supervise only one casino game were not similarly situated to retained employees who were licensed to supervise two or more games).

2. *Non–Discriminatory Reason for Layoff*

Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *Burdine*, 450 U.S. 248, 253, 101 S.Ct. at 1093–94 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3rd Cir.1995). If the defendant carries this burden, then the plaintiff must "have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *see Waldron*, 56 F.3d at 494.

■ EMR's proffered legitimate non-discriminatory reason for laying off Edwards is that economics compelled it to make a reduction in force. In its production areas, EMR was forced to decide how many employees it could afford to keep and, concurrently, which employees it could lay off without depleting its essential skill base and destroying its ability to manufacture its products.

Employees' skill bases were the prime factor in the layoff decisions, with some seniority policy also playing a role. Edwards knew how to process minitrons and to make targets, and had performed other functions at EMR as well. Other employees such as Kevin Lewis, not only could process minitrons and make targets, but also could perform other vital functions. Lewis had been hired to perform vacuum maintenance. He long had been recognized as the person at EMR who could troubleshoot the vacuum systems, diagnose problems, and make repairs. Lewis performed work that EMR normally would expect from an engineer, coming up with ideas and solutions which bettered the overall functioning and efficiency of EMR's production systems. Lewis's skill base was, then, as James Thornton has

put it, "a superset" of Edwards's. Having decided early in the layoff meeting that Lewis was indispensable, EMR managers ultimately determined that Edwards was a dispensable employee. Her main job functions could be, and would be, performed by Lewis, and possibly by others if the need arose.

Although mindful that a reorganization during a reduction in force may be used "as a cover to conceal discriminatory animus," *see Khair v. Campbell Soup Co.*, 893 F.Supp. 316, 326 n. 9 (D.N.J.1995) (citing cases), this Court concludes that EMR has proffered a legitimate, nondiscriminatory reason for the decision to lay off Edwards.

### 3. *Plaintiff's Rebuttal*

A plaintiff may survive summary judgment at this stage if she produces sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not the true reasons for the employment action. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3rd Cir.1996) (en banc) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3rd Cir.1994)). "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not *a* motivating or determinative cause of the employer's action." *Fuentes* 32 F.3d at 764 (emphases added).

Edwards points to a host of circumstantial evidence in attempting to show that the proffered legitimate, non-discriminatory reason for her layoff is a pretext and that discrimination in fact was a motivating factor: (1) Millard told her in November 1994 that in the event of a layoff she would lose her job to Lewis because she was a female and management was biased against females; (2) many months before the layoffs, two EMR department heads made a point of asking Lou Cardarelli if Edwards was performing her job capably: (3) Kevin Lewis was assigned to work the Ti-ball evaporator in the fall of 1994; (4) Edwards had experience operating and maintaining EMR vacuum systems, and was denied certain vacuum

training; (5) EMR began outsourcing vacuum repair work in the months after the March 1995 layoffs; (6) EMR's management was all-male and EMR was perceived by some as being unfriendly to women; (7) Lewis was promoted soon after the March 1995 layoffs: and, (8) the Ti-ball evaporator was moved to the outside building after March 1995 to make it easier for Lewis to process minitrons and make targets. Having reviewed this evidence thoroughly, this Court concludes that (1) Edwards has not adduced evidence sufficient to allow a factfinder reasonably to disbelieve EMR's proffered reason, but that, (2) Edwards *has* offered evidence sufficient to allow a factfinder reasonably to conclude that a discriminatory animus was more likely than not a motivating factor in the decision to lay her off. These conclusions are discussed in turn.

#### a. *EMR's Proffered Reasons*

To show that the employer's proffered reason is merely a pretext, the plaintiff must do more than show that the employment decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence'[.]" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3rd Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)).

Kevin Lewis was assigned to operate the Ti-ball evaporator in late 1994. Assuming for purposes of this discussion that Lewis was moved officially into Edward's group, this Court finds that Edwards advances no evidence showing that this move lacked legitimate business considerations or deviated widely from EMR's normal ways of utilizing its personnel. Thornton has testified that Edwards was busy processing minitrons at that time. Lewis was brought in to operate the Ti-ball evaporator because EMR had been producing a lot of minitrons which were failing due to uncleanliness in the system; it was thought that he could help to iron out

the problems. Throughout his tenure with EMR Lewis had performed functions across production and employee groupings. It is true that Lewis had said in the past that he wanted to work in minitron processing,[21] but this fact has little probative value here. In sum, Edwards adduces no evidence to show that Lewis was being moved into the generators group for some illicit purpose bound up with a plan to get rid of Edwards when layoffs became necessary.

Edwards attempts to muster facts to show that the issue of Lewis's vacuum expertise was pretextual. First, in her statement of facts, Edwards attempts to paint a picture of Lewis's vacuum systems duties, skills and experience as being no different from her own. Edwards points out that she operated and maintained vacuum equipment at her work station. She also makes much of the fact that John Frolio, Lewis's supervisor after the layoffs, "admitted" in his deposition that "[t]here's not much of a difference" between vacuum maintenance and operations work. (Frolio Dep. at 45).

The record is replete with facts and testimony establishing that Lewis was hired to maintain EMR's vacuum systems, that he worked on the systems plant-wide. that he was skilled at diagnosing problems, making repairs, minimizing down time, improving the systems' effectiveness, that he did work on the vacuum systems that one would expect of an engineer, and that he was regarded by management as the plant vacuums expert. Edwards knew only how to operate the vacuum systems in the outside building and to operate vacuums in connection with the Ti-ball evaporator. She had received some vacuum training[22] and could perform basic maintenance on the vacuum equipment. There is no evidence in the record that Edwards performed maintenance on vacuum systems anywhere other than at her work stations. Other than a reference to a time when Edwards stated correctly at a staff meeting that a pot was leaking (Edwards Dep. at 45), there is no indication in the record that Edwards repaired or diagnosed problems with any of EMR's vacuum systems.[23] John Frolio's statement about the nature of vacuum repair work provides very weak support for Edwards' argument.[24] There is no evidence creating a genuine issue of fact as to whether Edwards had done the same work on the vacuum systems as had Lewis.

Barely more credible is Edwards's argument that the fact that EMR began outsourcing vacuum work soon after her layoff shows that EMR's reasons for keeping Lewis instead of her were pretextual. It is true that EMR began to outsource some of its vacuum systems repair work to an outside contractor. There is no evidence that EMR was planning to outsource vacuum work all along. Nor is there evidence that Lewis soon abandoned all vacuum work once ensconced in Edwards' old job. Lewis continued generally to oversee the vacuum systems, to diagnose problems, to make the repairs as time permitted and to work with outside contractors when they were brought in. Lewis continued to troubleshoot the machines, find the problems, call in a repair contractor when needed, and exercise some measure of supervision over the contractor's physical repair work. (Lewis Dep. at 40–41; see Lewis Dep. at 42–44).

21. According to Lou Cardarelli, there was some indication in the months leading up to the 1995 layoffs that another minitron processor would be needed. (Cardarelli Dep. at 81). Cardarelli says that he had heard Lewis say on several occasions that Lewis "wouldn't mind working in processing full time." Cardarelli never heard Lewis say that he wanted Edwards's job. (Cardarelli Dep. at 80).

22. At some point in the past Edwards asked for additional vacuum training but was denied because of a lack of funding. (Edwards Dep. at 26). Absent some indication that the denial was based on her gender, that male employees had such requests granted, or that EMR paid for training for Lewis, this fact is irrelevant.

23. There is evidence that Edwards offered diagnoses of problems with the Ti-ball Evaporator in staff meetings, but not that she offered diagnoses of vacuum systems problems. (Edwards Dep. at 44).

24. Frolio was responding to a question about his own experience working with the vacuum systems. He compared replacing a gasket or a valve with running the equipment. (Frolio Dep. at 45). Frolio's deposition testimony betrays a basic lack of understanding of the plant-wide vacuum systems work that Lewis performed.

Lewis estimated that 30% of the vacuum work was being outsourced. (Lewis Dep. at 42). His role was to minimize the amount of time that outside contractors had to work by identifying problems rather than having the contractors charge EMR high hourly rates to do the same thing. (Lewis Dep. at 42). In August 1996 one of EMR's big vacuum furnaces failed and Lewis helped with the repairs along with the outside contractor. (Thornton Dep. at 142). From management's perspective, it continued to be important to have Lewis as a vacuums expert because EMR does not like to have outside contractors working in the radiation area (Thornton Dep. at 139, 142), an in-house expert is generally valuable, (Thornton Dep. at 143), and Lewis continued to be involved in working with the outside contractors (Thornton Dep. at 142–44).

If EMR's need to outsource some vacuum work after Lewis took over minitron processing duties proves anything, it is that EMR management was incorrect in believing that Lewis could perform the entirety of two jobs at once. But the factual dispute at issue is not whether EMR was "wise, shrewd, prudent, or competent," it is whether there was discriminatory animus. *Fuentes*, 32 F.3d at 765. Edwards cannot discredit EMR's proffered reason simply by showing that EMR's personnel decision didn't work out 100% as planned.

The fact that Lewis was promoted to Manufacturing Technical III not long after the layoff also has very little probative value. The evidence that Lewis was promoted to reflect the fact that he was doing work beyond what was expected of an hourly employee, and that he ran the vacuum systems like an engineer might be expected to do, is unrebutted. Thornton explains that the promotion and raise came as a recognition of Lewis's broad skill base and the fact that he was doing work not expected of a non-exempt employee; he was performing functions and making productions suggestions more befitting an engineer; he was making a lot of money for EMR by increasing the yield of working minitrons. (Thornton Dep. at 170–71, 176, 177, 178). Thornton's explanation is supported by contemporaneous internal

EMR correspondence. (Thornton Dep. Ex. 27, 28). The fact that Lewis's job duties did not change with his promotion thus is irrelevant. There is little probative evidence in the record to prove that a college degree was "required" to advance to Manufacturing Technical III in 1995. Edwards alleges only that Joe Pietras told her that employees with that job title "normally" have such degrees. Lewis says that Pietras told him in a conversation years ago that a degree was required. (Lewis Dep. at 39–40). Defendants deny that a college degree ever had been a requirement for promotion to a Manufacturing Technical III position. In any event, there is no evidence to show that any bypassing of normal promotion procedure was related to Lewis's gender.

There is evidence suggesting that Lewis had a "guardian angel" at EMR in the person of controller Mike Zito. (Lewis Dep. at 56, 59). The fact that Lewis survived the layoffs and then got a promotion, coupled with alleged comments which Lewis made to other employees about his guardian angel, leads Edwards to speak of Lewis's preferential treatment. But there is no evidence that Zito gave Lewis preferential treatment. Nor is there an inherent violation of the NJLAD where a member of an employer's management team does grant preferential treatment to a favored employee, as long as that employee is not treated preferentially because of his sex. There is no indication that Zito preferred Lewis because of his gender. What evidence there is suggests that if Zito did give special treatment to Lewis, it was because Lewis was friendly with him at a time when apparently few others were. (*See* Lewis Dep. at 56, 59).

Finally, Edwards mentions the fact that the Ti-ball evaporator was moved to the outside building so that Lewis could perform his job duties more efficiently. The record reflects that this move was initiated by James Thornton because he realized that it was inefficient to have the machine in the inside building. (Thornton Dep. at 146, 148). Edwards had discussed the inefficiency created by the Ti-ball evaporator with John Frolio in the past, (Frolio Dep. at 85), but she does not

claim that she ever had asked that it be moved. (Edwards Aff. at ¶ 15).

### b. *Gender as a Motivating Factor*

Turning now to the evidence that Edwards's gender was more likely than not a motivating or determinative factor in the decision to lay her off, this Court concludes that the most probative circumstantial evidence is Edwards's testimony about what Millard told her during the course of their November 1994 meeting regarding the low priority management gave to females, management's attitude towards having a female working in the outside building, and Edwards's likely fate in the event of a layoff. At this meeting, Millard told Edwards that managers did not like her working outside because she was a female, that women were never top priority, and that females never got the same kind of raises that men did. (Edwards Dep. at 47, 49–50).

■ For the reasons discussed above in the mixed motives analysis, Edwards's testimony about this meeting is not admissible direct evidence of discrimination. However, Millard was acting within the scope of her employment both when she attended management meetings and when she spoke with Edwards about her employment status. Her comments were warnings given to Edwards concerning the gender-biased attitudes, intentions and policies of EMR management. Therefore, Millard's comments are admissions of EMR's agent acting within the scope of her employment, and are admissible as circumstantial evidence to show that discrimination may have played a role in the layoff decision. *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir.1995) (where plaintiff's supervisor stated in plaintiff's presence, following management meeting prior to reduction in force, that "[t]hese damn people—they want younger people here." and, "[t]hey will be the one[s] that will be successful here," and supervisor acted within scope of employment in attending meeting, supervisor's statement was not hearsay, and district court abused its discretion in excluding plaintiff's affidavit recounting supervisor's comments); *Hybert v. Hearst*, 900 F.2d 1050 (7th Cir.1990) (where plaintiff's supervisor stated

that "the people in New York" were bent on replacing older salesmen with younger ones, and "[i]t's a concern of some of the guys in New York ....," and "there is a feeling in New York that ....," these statements were "direct warnings" from the supervisor "as to the attitude, intentions, and/or policy of higher-ups in management," and plaintiff's testimony about supervisor's statements was not inadmissible double hearsay); *Zipf v. American Tel. & Tel. Co.*, 799 F.2d 889 (3rd Cir. 1986) (where plaintiff relied on supervisor's statements to the effect that defendant was firing plaintiff in order to prevent her from becoming eligible for disability benefits, supervisor's statements were admissible as admissions of defendant's agent because supervisor was designated to deal with plaintiff regarding termination and spoke within scope of agency); *EEOC v. Learnol, Inc.*, No. 93 C 2950, 1994 WL 530711 (N.D.Ill. Sep.29, 1994) (statements made by sales manager, who participated in recruiting and gave input into hiring decisions, to plaintiff to effect that defendant wanted to hire young people were admissible as statements about attitudes and intentions of management); *see also Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132–33 (3rd Cir.1997) ("We have recognized that a plaintiff may offer circumstantial proof of intentional discrimination on the basis of age in the form of a supervisor's statement relating to formal or informal managerial attitudes held by corporate executives."); *United States v. Rioux*, 97 F.3d 648, 661 (2nd Cir.1996) (statements of agents with supervisory power regarding attitudes, intentions or policies of higher-ups in management do concern matters within agent's authority).

Because Millard's statements to Edwards are an admissible part of Edwards's case, the probative value of other circumstantial evidence may be enhanced in the judgment of a reasonable factfinder, and a number of inferences become justifiable. For example, in light of Millard's statements, a jury might find significant the fact that Harold Pfutzner and/or Mehrzad Mahzadi approached Lou Cardarelli and made inquiries about Edwards's capabilities which Cardarelli thought were tinged with gender bias. Though Mahzadi was replaced at EMR by Thornton

at the beginning of October 1994, and was not at any meetings which Edwards has suggested dealt with her layoff, Pfutzner was one of several people who helped to familiarize Thornton with Edwards' functions, her skills and her job performance in the Fall of 1994.

The fact that Edwards at all relevant times was the only female performing the type of work that she performed also is circumstantial evidence which a factfinder reasonably might connect to hostile attitudes regarding having, a female perform the work that Edwards was performing. Further, without addressing its admissibility item by item, this Court also concludes that Edwards's circumstantial evidence to the effect that EMR was unfriendly to females also may have increased probative value in light of the admissibility of her testimony about Millard's statements. This evidence may include testimony that EMR's all-male management team was known to some as "the Boy's Club," because of its practice of excluding Rebecca Millard from staff meetings, and proof that the sole female engineer at EMR allegedly was treated unequally in performance reviews.

### 4. *Conclusion*

While Edwards has not shown that EMR's proffered reason for laying her off is incoherent, inconsistent or contradictory, she has offered circumstantial evidence allowing a reasonable factfinder to believe that EMR's account does not provide the whole story, and that Edwards's gender was more likely than not a motivating or determinative factor in the layoff decision.[25] Therefore, Edwards has made the kind of demonstration necessary to survive summary judgment at this stage. Defendant's motion for summary judgment as to Count I is denied.

### V. The Breach of Contract Count

The second count of the Complaint alleges that Edwards was terminated in violation of Schlumberger's employee handbook and EMR's local procedures, and that this termination was a breach of contract.[26] Defendant contends that the employee handbook in effect at the time of Edwards's layoff, the 1994 handbook, set forth no policy on layoffs. Further, defendant argues that because both the 1989 handbook and the 1994 handbook contain explicit disclaimers that the handbook is not a contract of employment, there could be no breach of contract. Finally, defendant argues that even if there were a contract based on the handbook, defendant complied with the procedures set forth for the layoff of employees.

In New Jersey, "an employer may fire an employee for good reason, bad reason, or no reason at all under the employment at-will doctrine." *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 643 A.2d 546, 552 (1994). Employment is presumed to be at-will unless an employment contract states otherwise, *Varrallo v. Hammond,* 94 F.3d 842, 845 (3rd Cir.1996) (citing *Witkowski,* 643 A.2d at 552–53). "An employment manual providing terms and conditions of employment that include grounds and procedures for dismissal can create an employment contract." *Witkowski,* 643 A.2d at 549–50; *see Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985). However, "[a]n effective disclaimer by the employer may overcome the implication that its em-

---

**25.** There may be additional circumstantial evidence. For example, while this Court will not wade through the parties' arguments concerning EMR's seniority policy, how it was applied in Edwards's case, and what evidence might be admissible in this regard, any admissible evidence of deviations from normal layoff procedures may have probative value. There may also be favorable inferences to be drawn from the fact that at Generators Group meetings held in the Fall of 1994, Edwards's opinions about problems with EMR's equipment would be disregarded and/or disbelieved. (*See* Edwards Dep. at 43–46).

**26.** Edwards also argues now that she "is not claiming that defendant's handbook and/or policies took her out of at-will employment and protected her from termination except for just cause. Rather, claims [sic] that defendant failed to follow the layoff policies of which she and her coworkers were aware when it selected her for layoff." (Mem. in Opposition to Motion for Summary Judgment at 36). How this claim forms the basis of a breach of contract action under New Jersey law is not explained. This Court will address Edwards's cause of action as it is set forth in the second count of the Complaint.

ployment manual constitutes an enforceable contract of employment." *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 643 A.2d 554, 559 (1994). To be effective, a disclaimer must be expressed in language that makes it clear to reasonable persons that the manual was not intended to create legally binding obligations. *Id.*, 643 A.2d at 560. The disclaimer must be prominent and unmistakable. *Id.* "The language in the disclaimer must indicate, in straightforward terms, that the employee is subject to discharge at will." *Id.* (internal quotes and citation omitted).

■ Schlumberger's 1989 employee handbook contained a "Notice of Disclaimer" prominently located at the front of the book. It stated: "The handbook is not a contract or guarantee of employment, and does not change the longstanding right of either party to terminate the employment relationship at-will. Employees ... may be terminated by the Company at any time, for any reason, with or without notice." (Millard Aff., Ex. B at 3rd page). Schlumberger's 1994 handbook deleted the company's layoff policy, although defendant maintains that the 1989 layoff policy remained in effect. The 1994 handbook contained a disclaimer stating that the handbook "shall not be construed to form an express or implied contract between SWS–M/E and any of its employees...." It also stated that "either the employee or SWS–M/E can terminate the employment relationship 'at will,' i.e., with or without cause and at any time." (Millard Aff., Ex. C. at i).

Edwards refers in the Complaint to "[t]he employee handbook" and the "local procedures" subsection labeled "layoffs procedures" as the source of her implied contract. (Complaint at Second Count ¶ 2). She alleges there that she was terminated in violation of the handbook and the local procedures.

(Complaint at Second Count ¶ 3). Edwards states that her understanding was that lay-offs would be conducted in accordance with Schlumberger's local procedures; she states in her affidavit that the local procedures "constituted the only documentation distributed to defendant's non-exempt employees regarding defendant's layoff procedures." (Edwards Aff. at ¶ 11).[27] This Court does not understand Edwards to be saying that she did not receive any employee handbooks, let alone that no non-exempt employees received handbooks. Millard states that all Princeton employees received both the 1992 and 1994 handbooks. (Millard Dep. at 45, 46). Lou Cardarelli, a non-exempt EMR employee, has stated that he "really never read all the handbooks." (Cardarelli Dep. at 107).

The document that Edwards identifies as being the only written documentation she received on defendant's layoff policies contains a clear disclaimer. In a distinct section labeled "Termination" it states: "The Company is an employment-at-will employer, and reserves the right to initiate termination for any, or no, reason without prior notice." (Response to Motion for Summary Judgment, Ex. 13 at 7th page).[28]

On this record it is clear that defendant's employee handbooks, and the other relevant layoff procedures excerpt, contained precisely the kind of disclaimers which, under New Jersey law, defeat any implication of an employment contract which such publications otherwise might have created. Edwards's apparent effort to confuse the record by stating that she saw only the local procedures excerpt is unavailing. First, this excerpt too contains the disclaimer. Second, the Complaint bases the breach of contract claim on

27. Affidavits must be made "on personal knowledge," must set forth "such facts as would be admissible in evidence," and must "show affirmatively that the affiant is competent to testify to the matters asserted therein." Fed. R. Civ. Proc. 56(e); *see Maldonado v. Ramirez*, 757 F.2d 48, 50 (3rd Cir.1985). It is not at all clear that Edwards's claim as to what written documentation was distributed to non-exempt employees meets these requirements.

28. Edwards' exhibit No. 13 (marked plaintiff's exhibit 3 for deposition purposes) is referred to

by Edwards as the "local procedures" section. The first 3 pages of the exhibit do bear the heading "Local Procedures." However, the last 4 pages bear the heading "General Procedures." The "Layoff" section of the "General Procedures" section refers the reader to the local procedures. This exhibit represents what Edwards now alleges is the only layoff policy she saw. This Court takes the exhibit in the form in which it has been presented by Edwards.

both the employee handbook and the local procedures.[29]

Under New Jersey law, there was no employment contract between Edwards and Schlumberger. Accordingly, there could be no breach of contract. This Court need not address the issue of whether defendant complied with its layoff seniority policies. Defendant's motion for summary judgment as to the Count II is granted.

## VI. The Infliction of Emotional Distress Count

Count III of the Complaint alleges that the defendant's actions "inflicted emotional distress and mental anguish upon the plaintiff." This Count will be construed as a claim of intentional infliction of emotional distress.

■■■■■ "[T]o establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 544 A.2d 857, 863 (1988). The New Jersey Supreme Court has "circumscrib[ed] the cause of action with an elevated threshold for liability and damages." *Id.* The defendant must intend both to do the act and to cause emotional distress, or must act recklessly in deliberate disregard of a high degree of probability that emotional distress will result. *Id.* "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotes omitted).

■■■ Edwards has stated that she thinks about the layoff constantly and that it bothers her. She is resentful about the circumstances of her layoff, feels that she has no future and that she has been stepped on. As defendant notes, Edwards suffers no physical effects, has sought no professional help, has incurred no costs associated with her distress, attended college for a year after her

layoff, and has continued both to work and to seek work.

This Court need not reach the issue of whether defendant's conduct was sufficiently outrageous and intolerable. As a matter of law, Edwards's evidence is insufficient to support a finding that her distress was so severe as to go beyond what a reasonable person could be expected to endure. *See Buckley,* 111 N.J. at 368, 544 A.2d 857 (evidence insufficient as a matter of law where plaintiff described distress as loss of sleep, aggravation, embarrassment, headaches, and nervous tension). Defendant's motion for summary judgment as to Count III is granted.

## VII. The Breach of the Covenant of Good Faith and Fair Dealing Count

Count IV of the complaint alleges that defendant's actions "violated obligations of the defendant to deal with the plaintiff in good faith relative to the terms of her employment." This count will be construed as claiming a breach of the covenant of good faith and fair dealing.

■■■ Under New Jersey law, where employment is at will, no covenant of good faith and fair dealing exists. *Varrallo v. Hammond Inc.,* 94 F.3d 842, 848 (3rd Cir.1996) (citing *McQuitty v. General Dynamics Corp.,* 204 N.J.Super. 514, 499 A.2d 526, 529 (App. Div.1985)). Because, as discussed above, Edwards had no employment contract with defendant, her employment was at will and there could be no covenant of good faith and fair dealing for defendant to breach. Therefore, defendant's motion for summary judgment as to Count IV is granted.

## VIII. Conclusion

For the reasons set forth above, defendant's motion for summary judgment as to Count I of the complaint is denied. Defendant's motion for summary judgment as to

---

**29.** It also bears noting that the local procedures section discussing layoff procedure begins: *"Normally,* seniority will determine the order of lay-

off...." (Millard Aff., Ex. C at VII–5) (emphasis added).

Counts II, III and IV are granted. An appropriate order will be entered.