Philip VARRALLO, Appellant,

v.

HAMMOND INCORPORATED;
William Abel.

No. 95–5828.

United States Court of Appeals,
Third Circuit.

Argued July 25, 1996.

Decided Sept. 6, 1996.

George Duggan (argued), Newark, NJ, for Appellant.

Charles F. Waskevich, Jr. (argued), Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Appellees.

Before: BECKER, STAPLETON and MICHEL,* Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

After thirty-four years of service to his employer Hammond Inc., appellant Philip Varrallo was fired for allegedly falsifying his time cards. Insisting that he was simply following the instructions given to him by his supervisor William Abel, Varrallo brought suit in the Superior Court of New Jersey against his employer for breach of contract and against his supervisor for tortious interference in his employment. The case was removed to the United States District Court for the District of New Jersey, where summary judgment was granted to defendants on all counts. Because we agree with the district court that Varrallo's employment was "at will," we will affirm the judgment with respect to Hammond. Because there is a genuine issue of material fact regarding Abel's alleged interference, however, we will reverse the grant of summary judgment with respect to this claim and remand for further proceedings.

### I.

#### A.

We have plenary review over a grant of summary judgment, and apply the same test that the district court should have used originally. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3rd Cir. 1996). That is, a summary judgment should

* Hon. Paul R. Michel, United States Circuit Judge    for the Federal Circuit, sitting by designation.

be sustained only if there is "no genuine issue of material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, the non-moving party has supported his assertions regarding material facts by affidavits and other documentary material, a summary judgment in favor of the moving party cannot be affirmed. *Aman*, 85 F.3d at 1080. The facts set forth below are supported by documents and affidavits tendered by Varrallo.

### B.

Caleb Stillson Hammond founded what is now known as Hammond Incorporated ("Hammond") in 1900. In 1958, some years after relocating to New Jersey, the company hired Philip Varrallo as a draftsman. Varrallo was eventually promoted to Lead Technician in the drafting department. In 1989, his department head, William Abel, put Varrallo in charge of the "Hammond Atlas of the World" project. Although the original completion date was July 1992, it became apparent early that year that Hammond would not meet the target. Abel therefore instructed Varrallo to work as much overtime as necessary to complete the project,[1] giving him a key to open the building. Varrallo often started work at 6 AM, stayed late, and worked weekends.

That September, Abel asked Varrallo to work even more overtime.[2] Abel told Varrallo to start at 5 AM whenever he wished, but to put 6 AM on his time card because a 5 AM start would upset the payroll department. He instructed Varrallo to put the extra hour at the end of the day. He further told Varrallo: (1) to work through lunch, adding that time to the end of the day, (2) to add the hours accumulated by "snow time"[3] whenever he wanted, and (3) to take a few hours off with pay, because he was doing a good job.

In early 1993, Ann Roberts, Vice President of Human Resources, received complaints that Varrallo was overstating his hours. She examined his time records, and found that on two days, January 16 and January 30 of that year, Varrallo's time cards (which stated that he had worked from 6 AM to 4 PM on each of these days) conflicted with building security records (which indicated 5:54 AM–2:41 PM and 5:45 AM–2:53 PM hours). She reported this to Kathy Hammond, Executive Vice President and Chief Operating Officer of Hammond Inc., who decided to keep close watch of Varrallo's time records. Kathy Hammond told Abel about the apparent inconsistencies that had come up and instructed him to "see if he noticed anything." Abel never reported anything back to her.

Later, Roberts found that Varrallo's card from February 20th had apparently been altered, and told Kathy Hammond. Roberts also thought it strange that Varrallo's March 6th card only indicated hours of 6 AM–1 PM when he usually worked 6 AM–4 PM on Saturdays. She informed Kathy Hammond of this, but no action was taken. Roberts became more concerned when she compared Varrallo's March 18 and March 20 cards (which indicated 6 AM–5:30 PM and 6 AM–1 PM working hours, respectively, with a 12 noon–12:45 PM lunch break on the 18th) with Abel's reports regarding these days. Abel told Roberts that, on those days, Varrallo had left at 4:30 PM and 10:30 AM respectively. Upon hearing from Roberts of these latest apparent violations, Kathy Hammond at last decided "that we had enough violations of our policy to go ahead with termination." It was also decided that Roberts would first ask Varrallo about the apparent violations.

On March 24, 1993, Roberts called in Abel and Varrallo and confronted Varrallo about the February 20, March 6, March 18, and March 20 inconsistencies. Varrallo explained the February 20 alteration as having been

---

**1.** Regular hours were 8 AM to 4:30 PM with a 45 minute lunch.

**2.** Abel denies making the statements attributed to him in this paragraph. We accept Varrallo's account as true for purposes of this motion. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992).

**3.** Apparently, when the plant opened later than 8 AM due to snow, Hammond would give credit to the employees as if they had started at the normal time. Varrallo, of course, was unable to take advantage of this because he had already arrived at the plant and was working through this "free" time.

done by someone else, with no deceptive intent, and found nothing wrong with the March 6 card. As for the last two, he explained that he had come in before 6 AM on March 17[4] and was taking credit for it the next day, that he had left work at 12:05 PM on March 20, not 10:30 AM, and that there had been a two hour snow delay on March 16 for which he was taking credit later in that week. He related the instructions Abel had given him concerning coming in early, "snow time," and his time cards. Abel did not say a word during this meeting.

Upon hearing this explanation, Roberts said that she would have to investigate further. Specifically, she looked into the computerized building records to see if Varrallo's account of 5 AM openings was correct. She found that, at least for a two-week period in September 1992, the building records showed 5 AM openings while Varrallo's time cards showed 6 AM starts. She did not, however find anything that matched the January dates. The next day, Roberts called Varrallo and Abel into her office again and terminated Varrallo. Abel again said nothing.

## II.

This action was removed from New Jersey Superior Court, Law Division, by defendants pursuant to 28 U.S.C. § 1441. The district court had original jurisdiction over Count Four of the complaint, now dismissed, pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) (the Fair Labor Standards Act), and supplemental jurisdiction over the other counts pursuant to 28 U.S.C. § 1367. The district court also had original jurisdiction over all counts pursuant to 28 U.S.C. § 1332 (diversity of citizenship). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

### A.

▮ Varrallo's remaining claims[5] against Hammond depend on the existence of

a "for cause" termination requirement in their employment relationship. Under New Jersey law,[6] employment is presumed to be "at will" unless an employment contract states otherwise. *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 643 A.2d 546, 552–53 (1994). An employee manual or handbook may constitute an offer of such a contract by the employer, which employees may accept by continuing in their jobs. *Id.* 643 A.2d at 553.

In this case, two handbooks were presented to the court. The first, Hammond's 1984[7] handbook ("You & Hammond"), contains the following language:

*Evaluation Period*

At the time of your employment it is impossible for either you or the Company to know for certain that a permanent and mutually satisfactory relationship has been established. For both your benefit and the Company's, therefore, the first four weeks of your employment will constitute an Evaluation Period.

During your Evaluation Period you will be paid for actual time worked, and either you or the Company may terminate your employment without notice.

. . .

When this period has been completed and the evaluation is mutually favorable, and if the doctor's report on the physical examination confirms your fitness for work, you will then become a permanent employee and eligible to participate in the time-off, insurance and pension benefits provided by the Company and described in detail in this handbook.

(1984 Handbook at 1B.)

*Discharge*

Reasons for discharge are work shortage, incompetence, improper conduct, insubor-

---

4. Records show that the building was indeed opened at 5:22 that morning.

5. Two counts of Varrallo's original complaint (failure to give reasonable notice of termination and failure to pay for overtime) are no longer being pursued by him.

6. The parties agree that New Jersey law should apply.

7. It is unclear from the record whether this earlier manual was first distributed in 1983 or 1984. However, in keeping with the district court's opinion, we will refer to it as the 1984 handbook.

dination, dishonesty, or failure to abide by established working rules and procedures. Anyone discharged because of work shortage and who has been employed for one year or more will be given two weeks' notice or two weeks' pay in lieu of notice. For any other reason an employee may be discharged without notice and paid only for actual time worked.

(1984 Handbook at 5B.)

The revised manual from 1992 ("Hammond Employee Handbook") has the following parallel provisions:

**Introductory Period**

At the time of your employment it is impossible for either you or the Company to know for certain that a mutually satisfactory relationship has been established. For both your benefit and the Company's, therefore, the first 12 weeks of your employment will constitute an Introductory Period during which you and your Company will get to know and evaluate each other.

During your Introductory Period you will be paid for actual time worked, and either you or the Company may terminate your employment without notice. After four weeks of this Introductory Period you will become eligible, if full-time, to participate in the various benefits, such as health and life insurance described elsewhere in this handbook....

While it is the policy of the Company to encourage employees to make their business careers with us, the Company does not have any tenure of employment policy and reserves the right to terminate your employment at will with or without cause. The successful completion of this 12–week period should not be construed as creating a contract or as guaranteeing employment for any specific duration or as establishing a "just cause" termination standard.

(1992 Handbook § 2.5.)

**Guidelines for Conduct**

It is the policy of the Company that certain rules and regulations regarding employee behavior are necessary for the efficient operation of the Company and for the benefit and safety of all employees. Conduct that interferes with operations, discredits the Company, or is offensive to customers or fellow employees will not be tolerated. Employees are expected at all times to conduct themselves in a positive manner so as to promote the best interests of the Company. Such conduct includes:

· · ·

The following is some of the conduct that is expressly prohibited and may subject the individual involved to disciplinary action, up to and including dismissal.

· · ·

(h) Falsifying or altering any Company record or report, such as an application for employment, a medical report, a production record, a time record, an expense account, an absentee report, or shipping and receiving records;

· · ·

(1992 Handbook § 6.2.) The 1992 manual also includes other statements, similar to the one in the "Introductory Period" section above, that the employment of company employees remains "at will." (1992 Handbook §§ 1.2, 1.3.) Neither manual says anything more on the subject of termination.

The New Jersey courts have not set out rules governing when and if one employee handbook can supersede another.[8] Because we find that neither of Hammond's manuals is sufficient to create a contract of "for cause" termination, however, we do not reach this issue.

### B.

■ The Supreme Court of New Jersey has recently reaffirmed the principle that the effect of an employment manual depends on whether "when fairly read [it] gives rise to ... reasonable expectations ... that it confers enforceable obligations." *Witkowski*, 643 A.2d at 550. Two groups of factors are relevant in making the necessary determination: those having to do with the "manual's

---

**8.** The lone case dealing with multiple handbooks, *Preston v. Claridge Hotel & Casino*, 231 N.J.Super. 81, 555 A.2d 12, 15–16 (App.Div.1989), discusses a situation where both were independently sufficient and is therefore inapposite.

specific provisions," and those having to do with the "context of its preparation and distribution." *Id.* Neither party here challenges the district court's determination that Hammond's handbooks were widely distributed and intended for all employees; only the specific provisions of the manual are at issue.

The clear case, of course, is one in which the manual contains an express promise that termination of employment will occur only for specified causes. Such a manual when fairly read clearly "gives rise to ... reasonable expectations ... that it confers enforceable obligations" which are intended to displace the employer's unfettered discretion concerning termination. *Id.* Although *Witkowski* makes clear that expectations of this kind can arise even in the absence of such an express promise, it also expressly reflects "a recognition of basic contract principles concerning ... unilateral contracts" and the acceptance thereof. *Id.* at 553 (quoting *McQuitty v. General Dynamics Corp.,* 204 N.J.Super. 514, 499 A.2d 526, 529 (App. Div.1985)). Accordingly, the employment relationship remains an at-will one unless the manual provides some reasonable, affirmative basis for believing that the employer intended to limit its discretion. A binding obligation will be implied only where "the specific provisions of the manual relating to job security are sufficiently definite and comprehensive [to support] the conclusion that [the employer] intended those provisions to be regarded by its workforce as enforceable." *Id.* at 552. Stated conversely, where provisions relating to job security or termination are so terse or general that they cannot reasonably be regarded as intended to constrain the employer's discretion, the at-will relationship remains intact.

Here, Varrallo insists that he had a reasonable expectation of freedom from the employer's discretion based on two portions of the 1984 and 1992 manuals: the "Evaluation" or "Introductory" period provisions, and the provisions relating to discharge. We find no basis there for such an expectation.

When the manuals are fairly read, the only reasonable expectation that arguably could arise from the text of the "Evaluation Period" and "Introductory Period" provisions is the expectation that retention through the probationary period would entitle an employee to various fringe benefits during any further period of employment. This is not a case like *Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940 (D.N.J.1991), in which the handbook stated that "[d]uring the probation period, you are subject to termination without recourse to the grievance procedures afforded herein to regular employees." *Id.* at 949.

Turning to the provisions of the 1984 manual relating to discharge, they can accurately be described as cryptic. They are far less comprehensive than those involved in any of the New Jersey cases in which a binding commitment on the part of the employer has been implied. Absent are provisions calling for a progressive discipline process or for other protective procedures generally associated with legally enforceable rights. Moreover, because its list of reasons for discharge is non-exclusive and because it reserves to the employer the right to discharge for any "improper conduct," this portion of the manual seems clearly not intended to impose enforceable restrictions on the employer's discretion.

In *Witkowski,* the Supreme Court of New Jersey found a legally enforceable obligation despite the fact that the provisions of the manual regarding termination, like those here, contained only a non-exclusive list of reasons for discharge. It did so, however, only because "although the list of terminal offenses [was] not exhaustive, other grounds would be limited by the construction principle that they fall into the same class or category of violation." 643 A.2d at 551 (internal quotation omitted). Where the non-exclusive list contains a reason like "improper conduct," however, no basis exists for limiting "other grounds" for termination.

The provisions of the 1992 manual relating to employee "Conduct" similarly lack the definiteness and comprehensiveness necessary to provide a basis for implying a binding restriction on employer discretion. While somewhat more detailed than the corresponding provisions of the 1984 manual, these provisions are even less comprehensive

and definite in their treatment of employment termination. Employees are not told which conduct will lead to termination and which only to lesser discipline. Nor are they given any more specific notice of causes for termination than that the company "will not tolerate" any conduct which tends to interfere with operations, discredits the company, or offends customers and employees.

### C.

■ Because neither handbook affected the status of Varrallo's employment, he remained an employee "at will." As a result, there was neither a term of discharge only "for cause" nor a covenant of good faith and fair dealing between Varrallo and Hammond. *McQuitty v. General Dynamics Corp.,* 204 N.J.Super. 514, 499 A.2d 526, 529 (App.Div. 1985) (holding that no such covenant exists in "at will" employment relationships); *cf. Noye v. Hoffmann–La Roche, Inc.,* 238 N.J.Super. 430, 570 A.2d 12, 13 (App.Div.), *certif. denied,* 122 N.J. 146, 584 A.2d 218 (1990) (holding that such covenant does exist in contract implied from employment manual). Accordingly, summary judgment for Hammond was appropriate on both Varrallo's claims against Hammond: wrongful termination and violation of the covenant of good faith and fair dealing.

### IV.

■ Our determination that Varrallo's employment remained "at will," however, does not affect his claim of tortious interference with prospective economic advantage—that is, that Abel intentionally and wrongfully interfered with the continued employment of Varrallo at Hammond Inc. The Supreme Court of New Jersey has identified the four elements of a prima facie case for this tort: (1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with "malice," (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages. *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 563 A.2d 31, 37 (1989). We believe that there is sufficient evidence on all elements to survive summary judgment.[9]

■ The reasonable expectation requirement does not require a contractual right. *Id.* 563 A.2d at 38–39. That Varrallo was an at-will employee is irrelevant here; in New Jersey, this tort actually originated from cases in which a third party had induced termination of such an at-will employment relationship. *Zippertubing Co. v. Teleflex Inc.,* 757 F.2d 1401, 1405–06 (3d Cir. 1985); *see also Brennan v. United Hatters Local 17,* 73 N.J.L. 729, 65 A. 165 (1906) (recognizing cause of action for employee against local union that wrongfully revoked his membership, causing employer to end plaintiff's at-will employment). Varrallo, a 34–year employee of Hammond, certainly had a reasonable (if unenforceable) expectation of continued employment at the company.

■ Varrallo has also presented sufficient evidence regarding the second element—intentional and "malicious" interference.[10] The record shows that a genuine issue of fact exists regarding the following intentional and wrongful actions allegedly committed by Abel:

1. He ordered Varrallo to commit the acts for which Varrallo was fired.

2. He was informed by Hammond, sometime in March, that there were discrepancies in Varrallo's timecards. He was asked to report back with any information, but did not.

3. He told Roberts that Varrallo had left at 4:30 PM on March 18 and 10:30 AM on March 20. Varrallo claims to have left at 1 PM on the latter day. Not only did Abel lie about the March 20 departure, but he

---

9. Although the New Jersey courts continue to read *Printing Mart,* 563 A.2d at 37, as setting out a four-part prima facie case, *see, e.g., Platinum Management, Inc. v. Dahms,* 285 N.J.Super. 274, 666 A.2d 1028, 1043 (Law Div.1995), several panels of this court have read in a fifth element: defendant's knowledge of plaintiff's expected advantage. *See, e.g., Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1167 (3d Cir.1993). Whether or not this knowledge constitutes an additional independent requirement, it is satisfied here— Abel undoubtedly knew that Varrallo expected to stay employed at Hammond.

10. "Malice" in this context means wrongful and "without justification or excuse;" there is no requirement of ill will. *Printing Mart,* 563 A.2d at 39.

also failed to give any explanation for possible discrepancies with the timecards.

4. At the first meeting with Roberts and Varrallo, "by his silence he made it appear that he had not made the statements" authorizing unlimited overtime and "had not given [Varrallo] such instructions concerning [his] time card entries." Varrallo Affidavit at 6.

Such a pattern of behavior, if proved, would be sufficient to show intentional and wrongful interference.

The third element is causation. Abel contends on appeal that nothing he could have said would have saved Varrallo's job because the January 16 and 30 time card discrepancies cannot be explained. According to building records, Varrallo could not have been working as many hours as he claimed on those days. However, the apparent flurry of snow days in January (four between January 9 and January 17 alone), means that Varrallo, in addition to possibly working through lunch, might have been carrying over "snow time" from one or more of those days. With this in mind, any confirmation by Abel of Varrallo's explanation to Roberts might have caused her to view the entire situation more sympathetically. Furthermore, according to the deposition testimony of Roberts, it was not until Abel brought the apparent March discrepancies to the attention of Roberts and Kathy Hammond that Kathy Hammond decided "[t]hat we had enough violations of our policy to go ahead with termination." It is not clear that the January discrepancies, even if unexplained, would have caused Varrallo's termination by themselves. This too is a genuine issue of fact for trial.

Finally, Varrallo has clearly provided evidence of actual damages. He has made out a sufficient case for tortious interference to survive summary judgment.[11]

## V.

If Varrallo can prove his allegations, he will have shown wrongful and reprehensible behavior on the part of Abel and the right to a tort remedy therefor. He cannot, however, show that Hammond had any legal duty not to fire him, even on the weakest suspicion or none at all. Accordingly, we will affirm the judgment of the district court as to all claims against Hammond, reverse as to the claim against Abel, and remand for further proceedings consistent with this opinion.

---

11. The suggestion of the Supreme Court of New Jersey in *Printing Mart*, 563 A.2d at 43—that a suit against an employee of a company for tortious interference with prospective advantage expected to come from that company might be barred by the agency privilege set out in the Restatement (Second) of Agency § 343—would not apply to a case such as this one, where Abel allegedly was not, unlike Roberts or Kathy Hammond, acting "on behalf of" Hammond. Cases cited by the *Printing Mart* court as indicating this possible problem make it clear that an employee who acts for personal motives, out of malice, beyond his authority, or otherwise not "in good faith in the corporate interest" falls outside the scope of the privilege. *See, e.g., George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d 1326, 1333 (7th Cir.1983); *Murtha v. Yonkers Child Care Ass'n,* 45 N.Y.2d 913, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865, 866 (1978); *Kartiganer Assocs., P.C. v. Town of New Windsor,* 108 A.D.2d 898, 485 N.Y.S.2d 782, 783 (N.Y.App. Div.), *appeal dismissed,* 65 N.Y.2d 925 (1985); *Welch v. Bancorp Management Advisors, Inc.,* 296 Or. 208, 675 P.2d 172, 178 (1983), *modified on denial of reh'g,* 296 Or. 713, 679 P.2d 866 (1984).