799 A.2d 555 (2001)
351 N.J. Super. 558
DiMARIA CONSTRUCTION, INC., Plaintiff-Respondent,
v.
INTERARCH, Shirley Hill, and Raymond Klumb, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2001.
Decided May 7, 2001.
*557 Joel Sterns, Trenton, argued the cause for appellants (Frey, Petrakis, Deeb & Blum, attorneys, L. Oliver Prey and Heather Gelfand Ptasznik, on the brief).
Ellis I. Medoway argued the cause for respondent (Archer & Greiner, attorneys, Mr. Medoway and Arthur H. Jones, Jr., Haddonfield, on the brief).
BEFORE: Judges KING, COBURN and LEFELT.
*556 The opinion of the court was delivered by LEFELT, J.A.D.
Commerce Bank claimed plaintiff DiMaria Construction, Inc. breached its contract as general contractor for a construction project in a large office complex. Commerce terminated DiMaria's contract, and DiMaria sought arbitration. The arbitrators found that DiMaria's contract had been wrongfully terminated and awarded damages. Thereafter, DiMaria brought the instant action, for tortious interference with the Commerce contract, against defendants Shirley Hill, her firm Interarch, the interior designers of the offices, and Raymond Klumb, the architect. The matter came to trial before Judge Chaiet and a jury. The jury awarded DiMaria $750,000 in compensatory damages and $75,075 in punitive damages.
The defendants appeal, raising several points for our consideration. Among the points raised, defendants contend that DiMaria's tortious interference with contract claim was improper because defendants, as *558 agents of Commerce, were parties to the contract, and future lost profits should not have been awarded by the jury because these damages had previously been awarded in the arbitration. Defendants also challenge the judgment based on the entire controversy doctrine, various evidential errors and the failure to vacate the punitive damage award. We reject each of defendants' appeal points and affirm.

I.
In December 1993, Commerce hired DiMaria to do the interior fit-out and the heating, ventilation, and air conditioning ("HVAC") system for the project, a 35,000 square-foot office building, which would house a training facility dubbed Commerce University. Commerce hired Interarch, owned by Hill, to do the balance of the interior, including flooring and wall coverings. Hill is the wife of Vernon Hill, the founder and chairperson of Commerce. Klumb was the architect of the interior fit-out of the project. Klumb had contracted to provide architectural design services to Interarch. Klumb's association with Interarch provided approximately 90% of his business.
Nancy Siefert was the manager of the project for Commerce. Siefert claimed that Hill was actually "in charge" of the project and that Siefert took her orders from Hill, even though Hill was not her supervisor. Hill was described as a "difficult person to work for."
The interior fit-out contract called for DiMaria to "achieve substantial completion" of phase one of the project by January 28, 1994. Phase one consisted of approximately 20,000 square feet of interior space.
During the course of the project, Hill requested fifty-six changes to the planned work for which DiMaria prepared change orders. The orders estimated the cost of the proposed change and how much additional time would be needed to complete the project. Approximately fifty of these orders were approved by Hill. According to Siefert, this was a large number of change orders for a job of this size.
At around the time of change order # 40, Hill told DiMaria that it would be granted no more additional time to complete the project because the project needed to be complete for the May stockholders meeting. According to Dennis DiFlorio, chief retail officer and executive vice president of Commerce, DiMaria had been granted two, one-month extensions, so that the required completion date for phase one was March 31, 1994.
In the middle of March, Commerce received a temporary certificate of occupancy for phase one of the project and began moving tenants into the building in early April. The parties disputed when DiMaria completed phase one. According to Siefert, the completion of phase one was delayed by the poor quality of the plans prepared by Interarch from which DiMaria was working. DiMaria and Siefert testified that DiMaria completed phase one by the end of March. Hill and DiFlorio disagreed and contended that phase one was not completed by the end of March or beginning of April.
In early April, Hill and DiFlorio began discussing terminating DiMaria from the project and soon decided that DiMaria would be fired. Siefert disagreed with DiFlorio's and Hill's decision to fire DiMaria and discussed her opposition with them. Siefert concluded that the change orders extended the contract completion date by approximately fifty working days and that therefore DiMaria was not late. She reported the results of her analysis to Hill, but Siefert had the impression that Hill had already made up her mind.
*559 On April 14, 1994, Klumb signed a certification which stated that DiMaria had breached the contract terms by failing to substantially complete phase one by the required contract date. Klumb also stated that DiMaria's failure to meet the completion date had delayed the project, and that Commerce had suffered as a result. According to DiMaria and Siefert, Klumb was rarely on the project site.
Commerce terminated DiMaria in an April 14, 1994 letter stating that DiMaria had not substantially completed phase one by the required date. The letter also advised DiMaria that the HVAC contract was also terminated and contended that DiMaria had failed "to provide enough properly skilled workers or proper materials to complete phase 1, and to properly supervise and manage the job...."
After Commerce terminated DiMaria, Hill hired DiMaria's subcontractors to continue their work. The project was ultimately completed on time for the May shareholders meeting.
As a result of being fired from the project, DiMaria was unable to obtain a performance bond for its next commercial contract. So, in order to obtain this job, DiMaria acquired two commercial loans for $221,000 and $260,000 secured by mortgages on DiMaria's house. DiMaria's bond company was unwilling to give DiMaria a performance bond until mid-1918. Accordingly, DiMaria could not bid on commercial contracts that required bonding during this period. DiMaria's gross revenues dropped from a high of over $2.7 million in 1996, to a low of $1.6 million in 1998.
The interior fit-out and HVAC contracts between Commerce and DiMaria required that any controversy or claim arising out of the contracts be settled through arbitration. Defendants concede that neither Interarch, Hill, nor Klumb could have been joined in the arbitration under this clause.
On October 21, 1994, DiMaria filed a demand for arbitration against Commerce with the American Arbitration Association ("AAA"). DiMaria claimed it was wrongfully terminated from both contracts and sought damages of $190,000 for the interior fit-out contract breach and $91,000 for the HVAC contract breach. DiMaria also demanded "lost profit[s] for the work the termination prevented the Claimant from performing."
On September 26, 1995, after twenty-two days of evidentiary hearings, the arbitrators found that Commerce had wrongly dismissed DiMaria but that the requirements for punitive damages had not been met. The arbitrators found that DiMaria had been harmed in a number of ways: "Primarily [DiMaria was] placed in a position where other contracts were unavailable due to a lack of bonding ability and a lack of funds necessary to purchase material." The arbitrators awarded DiMaria $205,270 on the interior fit-out and HVAC contracts and $49,650 for "damages suffered by [DiMaria] related to all other contractual topics." Eventually, this award was confirmed in Superior Court and on appeal. Commerce Bank v. DiMaria Constr. Inc., 300 N.J.Super. 9, 692 A.2d 54 (App.Div.), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997), cert. denied, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).
On February 15, 1996, DiMaria filed a complaint in Superior Court against defendants. DiMaria charged the defendants with tortious interference with its Commerce contract and its prospective economic advantage. DiMaria alleged that Hill and Klumb intentionally interfered with the contract by executing and publishing a certification falsely stating that DiMaria had not completed phase one by *560 the completion date. DiMaria demanded compensatory and punitive damages, attorneys' fees, costs of suit and interest. The matter eventually came before Judge Chaiet and a jury and was tried between October 5 and 21, 1999. The jury returned a verdict in favor of DiMaria finding that it had proven that Hill and Klumb had tortiously interfered with the contract between DiMaria and Commerce. It further found that DiMaria had lost profits of $750,000 from September 1997 until the end of 2003. Moreover, the jury found that DiMaria was entitled to punitive damages against both Hill and Klumb. After a punitive damage hearing, the jury awarded DiMaria $75,000 in punitive damages against Hill and $75 in punitive damages against Klumb.
In ruling on defendants' motion for judgment n.o.v., Judge Chaiet found that Hill and Klumb could be held liable for tortious interference because they were not parties to the contract. The judge also found that there was sufficient evidence of malice on the part of Hill and Klumb to uphold the punitive damage awards against them. Subsequently, the judge granted DiMaria prejudgment interest of $155,388.75. After the judge entered judgment incorporating the jury's verdict and the interest award, defendants filed this appeal.

II.
Defendants contend that the trial judge erred in refusing to dismiss the tortious interference with a business relationship claim. First, they argue that defendants, as agents of Commerce, were parties to the contractual relationship and therefore could not be liable for tortious interference. Second, defendants argue that there was insufficient evidence from which the jury could conclude that they acted with malice.
The tort of interference with a business relation or contract contains four elements: (1) a protected interest; (2) malicethat is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages. MacDougall v. Weichert, 144 N.J. 380, 404, 677 A.2d 162 (1996).
We first consider defendants' second argument of insufficient evidence of malice. "Malice" as used in the tortious interference cause of action is not construed as ill will toward the plaintiffs. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739-751, 563 A.2d 31 (1989). Rather, malice is defined to mean that the interference was inflicted intentionally and without justification or excuse. Ibid.
Here, accepting all of DiMaria's evidence as true, the jury could have reasonably concluded that defendants acted with malice, that is intentionally and without justification or excuse. There was evidence that at the time Hill recommended DiMaria's termination and Klumb signed a certification authorizing the termination, DiMaria had already completed phase one of the project. What is more, there was evidence that plaintiff completed phase one on time, when the extensions of time granted in the change orders are taken into account. If the jury believed DiMaria's evidence that it completed phase one on time, then the firing was without justification or excuse.
We now consider defendants' first argument that as agents of Commerce, they could not be found responsible for tortious interference with Commerce's contract. Defendants moved for judgment at the close of all the evidence on the basis (in part) that as agents of Commerce, they *561 were parties to the contract and thus could not tortiously interfere with it. Judge Chaiet reserved decision. After the jury's verdict in favor of DiMaria, defendants moved for judgment n.o.v. on the same ground. The judge denied the motion, and defendants now assert error was committed.
Neither party challenges the contention that defendants were agents of Commerce. The tortious interference cause of action will only lie against defendants who are not parties to the contract. Printing Mart, supra, 116 N.J. at 752, 563 A.2d 31. The question then arises whether defendants, as agents of Commerce, can be held liable for tortious interference. In Printing Mart, supra, 116 N.J. at 760-63, 563 A.2d 31, the Supreme Court discussed that question without resolving it.
Since Printing Mart, a clear-cut consensus has emerged that if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie. See Fioriglio v. City of Atl. City, 996 F.Supp. 379, 392-93 (D.N.J.1998), aff'd, 185 F.3d 861 (3d Cir.1999), cert. denied, 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000) (employees acting within scope of employment may not be held liable for tortious interference); Obendorfer v. Gitano Group, Inc., 838 F.Supp. 950, 956 (D.N.J.1993) (employee who was acting within scope of his employment could not be held liable for tortious interference); Sammon v. Watchung Hills Bank, 259 N.J.Super. 124, 127, 611 A.2d 674 (Law Div.1992) (the officer and sole stockholder of a corporation may not be held liable for tortious interference).
If, on the other hand, the employee or agent is acting outside the scope of his or her employment or agency, then an action for tortious interference will lie. See Varrallo v. Hammond Inc., 94 F.3d 842, 849 n. 11 (3d Cir.1996) (employee may be held liable for tortious interference if he was not acting on behalf of the company); DeJoy v. Comcast Cable Communications, Inc., 941 F.Supp. 468, 477 (D.N.J.1996) (employees who were acting outside the scope of their employment may be held liable for tortious interference).
In Varrallo, supra, 94 F.3d at 849 n. 11, the Third Circuit stated that an employee or agent falls outside the scope of the privilege if he or she "acts for personal motives, out of malice, beyond his [or her] authority, or otherwise not `in good faith in the corporate interest.'" (quoting George A. Fuller Co. v. Chicago College of Osteopathic Med., 719 F.2d 1326, 1333 (7th Cir. 1983)).
In other jurisdictions, courts have applied these principals in the construction contract area. These courts have held that an architect has a conditional privilege to interfere in the contract of the general contractor and the subcontractorsthat is, the architect may interfere so long as he or she is not acting with malice, to further his or her personal goals, or to injure the contractor or subcontractor. Waldinger Corp. v. CRS Group Eng'rs. Inc., 775 F.2d 781, 790-91 (7th Cir.1985). Accord George A. Fuller Co., supra, 719 F.2d at 1333 ("[W]e conclude that Illinois would allow an architect a conditional privilege to interfere with the construction contract of its principal"); Geolar, Inc. v. Gilbert/Commonwealth, Inc., 874 P.2d 937, 941 (Alaska 1994) (agent-engineer was only privileged to the extent that he acted in his principal's best interest, if he acted in spite or malice, then interference with the contract was not protected); Dehnert v. Arrow Sprinklers, Inc., 705 P.2d 846, 850 (Wyo. 1985) ("An architect who acts within the scope of his contractual obligations to the owner will not be liable for advising the *562 owner to terminate a contractor's performance unless the architect acts with malice or bad faith").
In Geolar, Inc., supra, 874 P.2d at 941, the Alaska Supreme Court held that where the evidence was in conflict, it was the jury's function to decide whether the agent was acting within the scope of his or her agency by determining whether the agent acted in the interest of the principal or acted out of malice or personal interest.
Here, with regard to their roles in DiMaria's firing, the record could support either a finding that defendants acted within the scope of their agency or that they acted from personal interest and thus stepped outside the scope of their agency. On one hand, for example, Klumb, as the architect for the project, had the responsibility to certify whether sufficient cause existed to terminate DiMaria. He testified that he signed the certification because DiMaria failed to meet the completion date and therefore delayed the completion of the project. Hill testified that she recommended DiMaria's termination because DiMaria failed to complete phase one on time. These facts would support a finding that defendants merely acted in Commerce's corporate interest and thus within the scope of their agency when they took steps to fire DiMaria.
On the other hand, there was also evidence to support DiMaria's thesis that Hill and Klumb acted in their own personal interest when they recommended firing DiMaria. The project was delayed because of the abnormal number of changes that Hill requested and the poor quality of the plans drafted by Interarch. Pressure was put on Hill and Klumb to complete the project in time for the May stockholder's meeting. Accordingly, these facts would support a finding that Hill and Klumb fired DiMaria in order to blame DiMaria for all the project delays.
The jury was never given the opportunity to directly consider what motivated defendants to fire DiMariathe best interest of Commerce or defendants' self-interest and malice. The jury charge on tortious interference did not include an instruction on agency and did not request the jury to decide the related factual question of defendants' motivation in terminating DiMaria. However, defendants neither asked for an instruction on the agency issue nor objected to the jury instructions as given. The failure to object suggests that counsel "perceived no error or prejudice, and, in any event, prevented the trial judge from remedying any possible confusion in a timely fashion." Bradford v. Kupper Assocs., 283 N.J.Super. 556, 573-74, 662 A.2d 1004 (App.Div.1995), certif. denied, 144 N.J. 586, 677 A.2d 759 (1996). Any error, in this circumstance, to be reversible must amount to plain error, or error that was "clearly capable of producing an unjust result." R. 1:7-5.
The judge's charge on defendants' interference with Commerce's contract with DiMaria told the jury "[i]f the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair persons similarly situated, the ensuing loss to the plaintiff should be addressed." Moreover, the judge explained that the interference must be "[intentional] and with malice." He stated "For the purposes of this determination, the term malice is not used in the literal sense that would require a showing of ill will toward the plaintiff. Instead, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse."
The judge specifically explained that DiMaria "argues that it had substantially completed the contract and the defendants *563 intentionally caused the termination of it, without any justification." In summation, DiMaria's attorney argued that defendants were looking for someone to blame for the slow progress of the project. He argued that defendants purposely decided to "blame the contractor."
The judge in his charge also highlighted defendants' position by explaining to the jury that defendants contended the termination decision "was justified because DiMaria had failed to substantially complete the project in a timely manner. And the defendants, in their actions as it relates to this case, were simply performing their job responsibilities." In summation, defendants' attorney explained "We had a contract to do what we did. We did it and that is not unjustifiable interference in anything, ladies and gentlemen. Pure and simple."
Later, in explaining what the jury needed to know to determine whether punitive damages were warranted, the judge explained that DiMaria had to prove by clear and convincing evidence that defendants had acted maliciously or in "wanton and willful disregard of another's rights." The judge further explained that for this purpose, "[m]alicious conduct is intentional wrongdoing in the sense of an evil-minded act. Willful or wanton conduct is a deliberate act or omission with knowledge or a high degree of probability of harm to another who foreseeably might be harmed by defendant's acts or omissions and reckless indifference to the consequences of the acts or omissions." The judge thus explained to the jury that to award punitive damages, defendants' conduct must be wantonly reckless or malicious, evil minded, or a wanton and willful disregard of the rights of others. Fischer v. Johns-Manville Corp., 103 N.J. 643, 655, 512 A.2d 466 (1986).
Judge Chaiet rejected defendants' argument that as agents they shared in Commerce's immunity from tortious interference. He explained his rejection by interpreting the jury's verdict as follows:
The jury's finding in this case had to be premised on DiMaria's substantially completing the job and therefore a finding that there was no justification for terminating DiMaria. In addition, the jury found both Hill and Klumb liable for punitive damages. In order to find punitive damage[s] the jury had to be satisfied that the defendant's conduct was malicious or that defendants acted in wanton and willful disregard of another's right.
Implicit in the jury's finding is that the defendants acted in bad faith. It was plaintiff's position that since Commerce Bank was up against tight deadlines with the pressure of a shareholder's meeting looming on the horizon DiMaria was made a scapegoat for any delay so that any blame would not fall at the feet of Shirley Hill and Interarch [defendants]. Giving the plaintiff every favorable inference this logic is consistent with the jury's verdict.
After reviewing the law of agency and the evidence, the judge concluded that defendants were the agents of Commerce, but that defendants Hill and Klumb had acted with malice and in bad faith when they dismissed plaintiff and therefore had acted outside the scope of their agency:
The underlying factual rationale for the punitive damage finding signifies to this Court that Hill and Klumb acted outside the scope of their agency authority in issuing their recommendation to terminate DiMaria. Certainly the recommendation to terminate was within the scope of their authority but not when it was motivated for their own personal gain.

*564 As such the defendant's bad faith brings these defendants of the agency relationship and for the purpose of this tortious interference with contract claims these defendants may be considered third parties who are liable for tortious interference.
....
This Court also finds that [the] law does not permit an action for tortious interference by an agent or employee where the agent or employee does not exceed their authority. However, because a scapegoat finding is a logical inference from the jury's decision this Court finds that the defendants have exceeded the scope of their authority.
We agree with the judge's assessment of the situation. Considering the evidence that was before the jury and the absence of any objection to the jury charge, we agree with Judge Chaiet that it was implicit in the jury's verdict that defendants acted outside the scope of their agency.
The overall factual dispute confronting the jury as cast by the evidence, argument and the jury instructions was whether Hill and Klumb acted on behalf of Commerce in accordance with their contract or to protect their own personal interests by scapegoating DiMaria for the project delays. Given this evidential dispute, it would be inconsistent with the jury's verdict for the jury to have believed that defendants were simply performing their contractual duties on behalf of Commerce. If the jury believed defendants acted in the best interests of Commerce, then it could not have found that defendants, without justification, intentionally interfered with DiMaria's contract. The jury must have concluded that defendants were scapegoating DiMaria. In addition, the jury imposed punitive damages upon defendants. Therefore, the jury must also have considered that defendants attempt to unjustly blame the project delays on DiMaria was malicious. Thus, the jury implicitly rejected defendants' contention that they acted within the scope of their authority and in Commerce's best interest.

III.
Defendants also contend that DiMaria was barred from recovering future lost profits in the instant action because DiMaria had already recovered these profits in the prior arbitration award.
It is well established that if a plaintiff receives complete satisfaction of a judgment against one defendant, his or her rights against all others are concluded. Theobald v. Kenney's Suburban House, Inc., 48 N.J. 203, 206-7, 225 A.2d 10 (1966). See also Mitchell v. Procini, 331 N.J.Super. 445, 456, 752 A.2d 349 (App. Div.2000) (if a plaintiff settles the first action, then that settlement is credited against any damage verdict in the subsequent action). Moreover, if the amount of damages is decided in the first action, then that judgment is conclusive as to the amount of damages, and those damages may not be relitigated in the second action. McFadden v. Turner, 159 N.J.Super. 360, 366, 388 A.2d 244 (App.Div.1978).
DiMaria agrees that when a plaintiff has obtained full satisfaction for an injury, then he or she may not obtain a double recovery from another liable party. Nonetheless, DiMaria claims that it did not receive damages for future lost profits in the arbitration proceeding, and thus it is free to pursue that element of damages against defendants.
At the arbitration proceeding, DiMaria sought lost profits from three specific construction projects: (1) a Bordentown self-service car wash for which DiMaria sought projected lost profits of $47,800; (2) the *565 Greenberg residence for which DiMaria sought projected lost profits of $43,000; and (3) a Somers Point residence for which DiMaria sought projected lost profits of $30,000. Any of the other items DiMaria raised before the arbitrators as lost opportunities, including the Voorhees prospective project, were without specific damage assertions.
The arbitrators' award stated that DiMaria was damaged in a number of ways: "Primarily they [DiMaria] were placed in a position where other contracts were unavailable due to a lack of bonding ability and a lack of funds necessary to purchase material." The arbitrators thus awarded DiMaria $205,270 for the interior fit-out contract plus $49,650 "as a result of the damages suffered by Claimant related to all other contractual topics."
It appears to us that the $49,650 awarded in the arbitration proceeding related only to the lost profits on the three projects for which plaintiff presented detailed information at the arbitration proceeding. Any other lost opportunity claims were vague assertions. All of the specific and vague losses occurred in 1994-95, and the arbitration award was entered in September, 1995. We can find no evidence that the arbitrators awarded any "contractual topic" losses for the future. In a pre-trial ruling, Judge Gelzer ruled that DiMaria could present only evidence of profits lost after the arbitration. This was precisely what DiMaria did. The only lost profits DiMaria sought in this litigation related to profits allegedly lost after 1997, and the jury verdict sheet was specifically so limited. Accordingly, there was no overlap between the arbitration award and the judgment, and DiMaria is entitled to both.

IV.
The remaining points on appeal urged by defendants are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Nevertheless, we add the following brief comments regarding defendants' entire controversy argument.
In 1995, Commerce filed a complaint in Camden Superior Court seeking to bar the arbitration. Later, Commerce filed a complaint in Burlington County seeking to vacate the arbitration award. DiMaria, in his answer to both complaints, notified the courts in Camden and Burlington that plaintiff was contemplating bringing a separate action against defendants Hill and Interarch. This notification was in compliance with R. 4:5-1(b)(2).
However, plaintiff did not specifically name Klumb as a potential defendant in a future suit in either the Camden or Burlington actions. Klumb suffered no prejudice from this failure because he was well aware of the arbitration action plaintiff filed against Commerce; he testified during the evidentiary hearings at the AAA. Further, his close association with Hill and Commerce and his position as the architect of the project would have alerted Klumb that if Hill and Interarch were potentially liable to plaintiff, then he would be too.
DiMaria's failure to notify the courts about Klumb was thus not "inexcusable." R. 4:5-1(b)(2). DiMaria did tell the courts that it had a possible action against Hill, Interarch, and "possibly others." A simple inquiry would have disclosed that Klumb was one of the possible others. Therefore, the remedy of preclusion is inappropriate here, and Judge Lehrer properly refused to dismiss the instant action.
DiMaria was also brought in as a third-party defendant in a Middlesex County lawsuit that resulted from DiMaria's contract with 1700 Horizon Associates. In the Middlesex action, DiMaria did not file a certification naming non-parties like defendants who might have *566 potential liability. But it was not required to do so under R. 4:5-1(b)(2). The Middlesex action and the instant action concerned different contracts. Thus, the two proceedings were not based upon the same transactional facts. Vision Mortgage Corp. v. Patricia J. Chiapperini, Inc., 156 N.J. 580, 584, 722 A.2d 527 (1999).
In conclusion, we have carefully considered each of defendants' contentions. Our review of the entire record in light of the parties' arguments and the pertinent law convinces us that no reversible error has occurred. Therefore, the judgment appealed from should be and is hereby affirmed.
Affirmed.