**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3404
_____

DAMIAN J. CIONI,
Appellant

v.

GLOBE SPECIALTY METALS, INC.; MALCOLM APPELBAUM;
JEFFREY BRADLEY; ALAN KESTENBAUM; MARK COHEN
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 2-10-cv-01388)
District Judge:  Honorable Esther Salas
_____

Submitted Under Third Circuit LAR 34.1(a)
June 26, 2015
_____

Before: CHAGARES, KRAUSE and BARRY, <u>Circuit Judges</u>

(Opinion Filed: July 23, 2015)
_____

OPINION[*]
_____

---

[*]  This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

BARRY, Circuit Judge.

This matter arises out of a hiring agreement between Damian Cioni and Globe Specialty Metals, Inc. ("Globe") in which Globe promised, but never granted, Cioni unvested options in company stock. Cioni appeals the District Court's grant of summary judgment for the defendants. We will affirm.

**I.**

Cioni was recruited to join Globe by its CFO, Malcolm Appelbaum, who believed that he had the authority to negotiate the terms of Cioni's employment and compensation. On April 29, 2009, Cioni accepted and signed Appelbaum's third offer of employment. The terms included a grant to Cioni of 30,000 unvested stock options, which were to vest in thirds on the first, second, and third anniversaries of Cioni's employment. The agreement did not condition termination in any way, and Cioni understood that his employment at Globe could end before the options vested. Cioni began working at Globe on June 29, 2009 as its Vice President of Tax, reporting directly to Appelbaum.

Sometime before October 2009, Appelbaum learned that he lacked authority to promise stock options to Cioni. Under Globe's stock plan, the options could only be granted after approval from Globe's Board of Directors (the "Board"), and Cioni's grant was made "under and subject to the terms and conditions of our stock plan." (App. 206.) Cioni's options were never put to the Board for a vote and, thus, never granted. When Appelbaum brought the options to Alan Kestenbaum, the Board's Chairman, Kestenbaum

refused to add the vote to the Board's meeting agenda because he believed that a 30,000-option grant was an "out-sized option package" relative to Cioni's "reporting position[] . . ., which is not an income-generating type position" and that, as such, the grant was not in the interest of Globe's shareholders. (Supp. App. 100–01, 103.) According to Kestenbaum, Appelbaum could have asked another Board member to put the grant to a vote, but there is no indication that he did so.

In October and November 2009, Globe attempted to renegotiate Cioni's compensation. The Board delegated authority to Kestenbaum and Globe's CEO, Jeffrey Bradley, to grant options, subject to an overall cap, to Cioni and two other employees whose compensation packages were to be adjusted. Under this authority, Bradley and Appelbaum made Cioni a written offer of 15,000 options. The offer was subject to Cioni's acceptance by signature, which he never provided. Although the new offer did not expressly waive the originally promised 30,000 options, Cioni testified, when deposed, that he understood that the 15,000 options were offered "in lieu of" the 30,000 options and that he never understood Globe to be offering him a total 45,000 options. (Supp. App. 71–72.) Appelbaum also assured Cioni that Globe would "try[] to make up some portion of the other half in cash through yearly bonuses." (App. 110.) But when Cioni requested a written guarantee, Appelbaum declined.

Cioni rejected Globe's offers and hired counsel. He did so against Appelbaum's advice, who told him that Kestenbaum would not appreciate Cioni hiring counsel. On November 12, 2009, Cioni's attorney spoke to Globe's in-house counsel. The

conversation appears to have been an attempt by Cioni to claim rights to both options offers. In the words of his attorney, the "entire conversation" was about the "45,000 stock options owed to Mr. Cioni," as well as "some retaliation going on" against Cioni regarding the options. (Supp. App. 107–09.)

Bradley fired Cioni the following day, November 13, 2009. The circumstances of his termination are contested. Cioni testified that Bradley told him that his termination was due to "a legal issue." (App. 87.) Globe's interrogatory answers asserted various reasons: Cioni's unwillingness to revise his compensation package; average to below-average performance; accessing inappropriate websites at work; and Cioni's "bad faith claim[]" that he was entitled to 45,000 options. (App. 163.) Bradley testified that Cioni was terminated because he was under-performing. Appelbaum testified that he recommended Bradley terminate Cioni because Cioni was asking for more compensation than had been promised and because the working relationship had become "strained and difficult." (App. 101–02.) Appelbaum further testified that, although Cioni's work product had "certain issues," that was not the reason he recommended termination. (*Id*.)

Cioni brought suit against Globe, Appelbaum, Kestenbaum, and Bradley[1] on March 16, 2010, in an 11-count complaint. The defendants moved for summary judgment on eight of the counts on August 31, 2012, and the District Court granted the motion in its entirety on April 30, 2013. On June 26, 2013, the defendants sought leave to file a second motion for summary judgment on the remaining three counts, which the Court

---

[1] Cioni also named Mark Cohen, the headhunter who had recruited him to Globe, as a defendant, but no claims against Cohen have been appealed.

4

permitted,[2] and granted the motion in its entirety. Cioni timely appealed the Court's grant of summary judgment on eight of the eleven counts.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment, applying the same standard as the District Court. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010). "Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)).

## III.

### A.  Counts One and Two: Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

The parties agree that Globe breached its employment contract with Cioni by failing to grant the promised 30,000 unvested options, but disagree whether Cioni suffered damages from the breach. Cioni contends that stock options do have value, albeit a fluctuating one, and Globe's breach denied him the anticipated value. He proffers an

---

[2] Cioni faults the District Court's allowance of a second motion for partial summary judgment, which he contends was untimely because it was filed more than "30 days after the close of all discovery." Fed. R. Civ. P. 56(b). That Rule is only a default timing provision, however; Rule 56 grants district courts discretion to "order[] otherwise." *Id.* This discretion permits "[s]cheduling orders [to be] tailored to the needs of the specific case, perhaps adjusted as it progresses, [which is] likely to work better than default rules." Fed. R. Civ. P. 56 comm. n. (2009). We find no error in the Court's allowance of the motion, particularly as a trial date had not yet been set.

expert's estimation of the options' value and cites deposition testimony and out-of-state case law endorsing this valuation method.

Cioni's argument, however, supports valuing unexercised options – where an options holder possesses a present right to purchase shares – but not valuing unvested options – where an options holder possesses only a conditional promise of a future right, but no present right, to purchase shares. Cioni himself acknowledged, when deposed, that unvested options were valueless to him. Without damages, of course, Cioni cannot sustain a claim for breach of contract.[3] Cioni's claims for breach of the implied covenant of good faith and fair dealing, however phrased,[4] fail for the same reason.

## B.    Counts Three and Nine: Wrongful Discharge and Retaliatory Discharge for Hiring Counsel

Cioni also claims that he was wrongfully terminated in retaliation for retaining an attorney to advise him regarding his rights to the options. Unfortunately for Cioni, this claim runs up against New Jersey's presumptive preference in favor of at-will

---

[3] Cioni alternatively argues that Globe's breach harmed him because, by joining Globe, he relinquished stock options at his prior company. He did not, however, make this alternative harm argument before the District Court and cannot do so for the first time before us.

[4] Cioni's complaint pled his implied covenant claim as an unlawful termination that was not based on "willful misconduct," "poor performance," or "negligence," (App. 56–57), but in opposing summary judgment, he argued that Globe breached the implied covenant because he was terminated in bad faith to foreclose his claim to the unvested options. Even had Cioni shown that damages lie for such a claim, the claim would fail against New Jersey's presumptive preference for an employer's right to terminate an employee at will. *See Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 512 (N.J. 1980); *see also Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1107 (N.J. 2009) (citing *Pierce*, 417 A.2d at 512). Lastly, Cioni claimed that Globe breached the implied covenant by failing to present his options to the Board for approval, a claim unsustainable as a duplication of his breach of contract claim.

termination. An employee has a claim for wrongful discharge only "when the discharge is contrary to a clear mandate of public policy." *Pierce*, 417 A.2d at 512. Such public policy may be found in judicial decisions, among other sources. *Id.* Cioni contends that New Jersey has a clear public policy favoring an employee's right to consult counsel and that this policy is expressed in a series of cases holding that an employee's waiver of claims against his employer must be knowing and voluntary.[5] *See, e.g.*, *Keelan v. Bell Commc'ns Research*, 674 A.2d 603, 608 (N.J. Super. Ct. App. Div. 1996). To evaluate such waivers, courts consider, among other factors, whether the employee had an opportunity to consult counsel and whether the employer encouraged doing so. *Swarts v. Sherwin-Williams Co.*, 581 A.2d 1328, 1332 (N.J. Super. Ct. App. Div. 1990). We are unconvinced that these factors – only two of eight non-exhaustive factors to be weighed in a totality of the circumstances test – constitute a clear public policy.

Even were these cases to establish a public policy protecting employees who consult counsel regarding potential waivers, however, Cioni has not pointed to evidence that that is what he was doing. Cioni testified that he understood that the 15,000 options were offered to replace the original 30,000, and his attorney testified that she contacted Globe to assert Cioni's right to all 45,000 options. In other words, the record before us suggests that Cioni hired counsel to pursue his claim – not to advise him regarding a potential waiver. This distinction is vital because, under *Pierce*, employers may lawfully

---

[5] Cioni similarly claims the United States has a parallel public policy, and cites 29 U.S.C. § 626(f)(1)(E). But § 626(f)(1)(E) is expressly limited to an employee's waiver of claims of age discrimination under the Age Discrimination in Employment Act, which has no relevance here.

discharge employees who retain counsel in a dispute against the employer. *See, e.g.*, *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 804 (N.J. 1990) (terminating an employee who "has retained a lawyer to protest the employer's actions . . . is a legitimate, non-discriminatory method of handling the daily operations of a business"); *Alexander v. Kay Finlay Jewelers, Inc.*, 506 A.2d 379, 381 (N.J. Super. Ct. App. Div. 1986) ("There is no statutory or regulatory proscription against a firing in retaliation for the institution of a civil action against the employer as a means of resolving a salary dispute.").

## C. Count Five: Defamation

Cioni claims Appelbaum defamed him by telling other Globe employees that he was terminated for asking for more compensation than his contract offered. But, as discussed, Cioni's attorney did assert that Cioni had a right to 45,000 stock options. He did not. He never accepted Globe's second offer of 15,000 options and, moreover, understood it to be an offer replacing the originally promised 30,000 options. Truth is a defense to defamation. *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011).

## D. Counts Six and Seven: Fraud and Negligent Misrepresentation

In these counts, Cioni contends that Appelbaum induced Cioni to come to Globe by fraudulently, or negligently, misrepresenting that Globe would grant him 30,000 stock options without actually intending to do so. He also claims that Appelbaum endorsed the fraud after Cioni's employment began by continuing to represent that Cioni's options were forthcoming when they were, in fact, not. Because Cioni's argument is, in essence,

that Appelbaum promised Globe would grant options when Globe would not – the very same promise that Globe contracted to perform – Cioni's claims are barred by the economic loss doctrine. *See Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 672–73 (N.J. 1985); *Saratoga at Toms River Condo. Ass'n, Inc. v. Menk Corp.*, 2014 WL 3510872, at *5 (N.J. Super. Ct. App. Div. July 17, 2014) ("[E]conomic expectations between parties to a contract are not entitled to supplemental protection by negligence principles.").

Cioni, citing *Kaplan v. GreenPoint Global*, argues that the economic loss doctrine does not bar claims of misrepresentations made to induce a party into a contract. But in *Kaplan,* the defendants allegedly misrepresented the company's financial success to induce the plaintiff to join the company. *See* Civ. No. 11-4854, 2012 WL 2992572, at *6 (D.N.J. July 20, 2012). The misrepresentations were apparently related to, but distinct from, the parties' expectations under the contract. *See also McConkey v. AON Corp.*, 804 A.2d 572, 586 (N.J. Super. Ct. App. Div. 2002) (defendants misrepresented company's future growth and likelihood of being sold, inducing plaintiff to accept employment only to be laid off seven months later when company was sold). Here, however, the representations were false promises to perform as contracted. *Cf. Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) (holding architect's cause of action under tort, alleging that turfgrass corporation negligently performed its contractual duties to prepare and design turf specifications for athletic field, arose only out of contract).

**E.     Count Ten: Tortious Interference with Contract**

Finally, Cioni asserts that Kestenbaum tortiously interfered with Cioni's employment contract in two ways: first, that he effectively vetoed Board approval of Cioni's promised stock options; and second, that he caused Cioni's termination. As to the first, Cioni has not pointed to evidence that Kestenbaum's actions exceeded the scope of his duties as the Board Chairman. New Jersey's tort of interference with contract cannot lie against Globe, a party to the contract, nor against Kestenbaum, unless he acted outside the scope of his duties. *See Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37–38 (N.J. 1989); *DiMaria Constr., Inc. v. Interarch*, 799 A.2d 555, 561 (N.J. Super. Ct. App. Div. 2001). When deposed, Kestenbaum testified that his decision not to include a vote on Cioni's options on the Board's meeting agenda was within his authority as Chairman, and Cioni has not pointed to contrary evidence. Kestenbaum further testified that the other Board members also had authority to put Cioni's options to a vote, yet Cioni has presented no evidence that any of them attempted to do so or that Kestenbaum improperly prevented any of them from doing so. Finally, Cioni has not shown that Kestenbaum did anything outside of his authority as Chairman that a jury could reasonably find caused Cioni's termination.

**V.**

We will affirm the orders of the District Court.

10